United States Court of Appeals
for the Fourth Circuit
No. 24-4114

───────────────────────

United States,
Appellee,
v.

Brandon Jackson,
Appellant.

───────────────────────

Appeal from the United States District Court
for the District of Maryland
No. 1:22-cr-141-ELH

───────────────────────

**Appellant's Opening Brief**

James Wyda
Federal Public Defender

Cullen Macbeth
Assistant Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 344-0600
cullen_macbeth@fd.org

Counsel for Appellant

# Table of Contents

Page

Table of Authorities ..................................................................................iv

Introduction ............................................................................................1

Jurisdictional Statement .........................................................................3

Issue Presented .......................................................................................3

Statement of the Case .............................................................................3

    A.    Proceedings in Arizona state court .......................................3

    B.    Proceedings in the District of Maryland .............................5

        1.    Arrest and indictment ...............................................5

        2.    Motion to dismiss the indictment .............................6

        3.    District court's denial of Jackson's motion ..............8

        4.    Guilty plea and sentencing ......................................10

Summary of the Argument.....................................................................10

Argument................................................................................................12

I.    Section 922(n) violates the Second Amendment as applied to Jackson ........12

    A.    Standard of review ..........................................................12

    B.    Legal background .............................................................13

        1.    Before *Bruen*, lower courts assessed Second Amendment challenges through a deferential form of means-ends balancing..............................................13

i

2. *Bruen* rejected deference to legislatures in favor of "text and history" .......................................................................... 15

C. Discussion ......................................................................... 18

1. Jackson is covered by the Second Amendment's plain text ...... 18

    a. *Rahimi* rejected attempts to limit Second Amendment coverage to "law-abiding, responsible citizens." ................................................................... 22

    b. Alternatively, felony indictees cannot be deemed non-"law-abiding." ........................................................ 27

2. The sources cited by the district court do not demonstrate that § 922(n) can constitutionally be applied to Jackson ...................................................................... 29

    a. Disarmament of "dangerous" groups ........................... 29

        i. The Supreme Court has rejected reliance on "vague," excessively broad categories like "dangerous." ................................................... 29

        ii. The sources cited by the district court do not establish a history of disarming "dangerous" groups ............................................................ 33

        iii. The government did not show Jackson is "dangerous." ................................................... 41

    b. Pretrial detention .......................................................... 46

        i. The "why" ........................................................... 49

        ii. The "how" .......................................................... 51

    c. Surety statutes ............................................................... 55

Conclusion......................................................................................59

Statement Regarding Oral Argument ..................................................61

Certificate of Compliance ......................................................................62

Certificate of Service ............................................................................63

## Table of Authorities

Page(s)

**Federal Cases**

*Alexander v. United States*, 686 F. Supp. 3d 608 (W.D. Mich. 2023) ..........19, 26, 29

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N.J.*,
    910 F.3d 106 (3d Cir. 2018) ....................................................................15, 45

*United States v. Van Dyke*, 2024 WL 1514129
    (D. Idaho Apr. 8, 2024) ....................................................................43, 44, 57

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .........................................*passim*

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) ...........................................................14

*Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021) (en banc)......................................14

*Folajtar v. Att'y Gen.*, 980 F.3d 897 (3d Cir. 2020).................................................40

*Garland v. Range*, ____ S. Ct. ____, 2024 WL 3259661 (U.S. July 2, 2024) ............ 21

*Harley v. Wilkinson*, 988 F.3d 766 (4th Cir. 2021) .................................................14

*Kaley v. United States*, 571 U.S. 320 (2014).............................................................58

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) .............................................31, 37, 40

*Koons v. Platkin*, 673 F. Supp. 3d 515 (D.N.J. 2023)...............................................39

*Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019) ............................................... 31

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022)........*passim*

*New York State Rifle & Pistol Ass'n, Inc. v. City of New York*,
    140 S. Ct. 1525 (2020)...................................................................................14

*Peruta v. Cty. of San Diego*, 742 F.3d 1144 (9th Cir. 2014).....................................14

*Range v. Att'y Gen.*, 69 F.4th 96 (3d Cir. 2023) (en banc) ............................... 21, 25

*Rogers v. Grewal*, 140 S. Ct. 1865 (2020) ................................................................ 14

*United States v. Alvarez*, 567 U.S. 709 (2012) ........................................................ 32

*United States v. Bartucci*, 658 F. Supp. 3d 794 (E.D. Cal. 2023) ...................... 28, 48

*United States v. Bena*, 664 F.3d 1180 (8th Cir. 2011) ............................................ 40

*United States v. Bullock*, 679 F. Supp. 3d 501 (S.D. Miss. 2023) ............................ 38

*United States v. Call*, 874 F. Supp. 2d 969 (D. Nev. 2012) ............................... 27, 28

*United States v. Chapman*, 666 F.3d 220 (4th Cir. 2012) ................................... 12, 13

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) ......................................... 14

*United States v. Coleman*, 2023 WL 6690935 (E.D. Va. Oct. 12, 2023) ................. 25

*United States v. Cousar*, 2024 WL 1406898 (D. Kan. Apr. 2, 2024) ...................... 36

*United States v. Darosa*, 102 F.4th 228 (4th Cir. 2024) ......................................... 27

*United States v. DeBorba*, 2024 WL 342546
  (W.D. Wash. Jan. 30, 2024) ...................................................................... 36

*United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024) ...................................*passim*

*United States v. Gore*, 2023 WL 2141032 (S.D. Ohio Feb. 21, 2023) ..................... 26

*United States v. Harrison*, 654 F. Supp. 3d 1191 (W.D. Okla. 2023). ..................... 35

*United States v. Hicks*, 649 F. Supp. 3d 357 (W.D. Tex. 2023) ........................*passim*

*United States v. Holden*, 638 F. Supp. 3d 931 (N.D. Ind. 2022) ............................. 58

*United States v. Hosford*, 843 F.3d 161 (4th Cir. 2016) ......................................... 13

*United States v. Jimenez-Shilon*, 34 F.4th 1042 (11th Cir. 2022) ........................... 35

*United States v. Johnson*, 2023 WL 6690388 (N.D. Ill. Oct. 12, 2023).................... 21

*United States v. Kays*, 624 F. Supp. 3d 1262 (W.D. Okla. 2022) ........................... 26

*United States v. Kelly*, 2022 WL 17336578 (M.D. Tenn. Nov. 16, 2022) ............... 39

*United States v. Laurent*, 861 F. Supp. 2d 71 (E.D.N.Y. 2011)..........................*passim*

*United States v. Leblanc*, 2023 WL 8756694 (M.D. La. Dec. 19, 2023)................... 41

*United States v. Lewis*, 682 F. Supp. 3d 1038 (S.D. Ala. 2023) ............................... 26

*United States v. Mahin*, 668 F.3d 119 (4th Cir. 2012) ............................................ 14

*United States v. Melendrez-Machado*, 677 F. Supp. 3d 623 (W.D. Tex. 2023) ......... 39

*United States v. Neal*, 2024 WL 833607 (N.D. Ill. Feb. 7, 2024) ........................... 36

*United States v. Ortiz*, 669 F.3d 439 (4th Cir. 2012)................................................ 27

*United States v. Pierre*, No. 1:22-cr-20321-JEM
     (S.D. Fla. Nov. 28, 2022).............................................................................. 26

*United States v. Posada*, 670 F. Supp. 3d 402 (W.D. Tex. 2023) ........................... 48

*United States v. Prince*, 2023 WL 7220127 (N.D. Ill. Nov. 2, 2023) ...................... 36

*United States v. Quiroz*, 629 F. Supp. 3d 511 (W.D. Tex. 2022) ................. 28, 54, 58

*United States v. Rahimi*, 144 S. Ct. 1889 (2024) ................................................*passim*

*United States v. Reaves*, No. 4:22-cr-224-HEA
     (E.D. Mo. Jan. 9, 2023).........................................................................*passim*

*United States v. Rogers*, 2024 WL 692701 (N.D. Ohio Feb. 20, 2024).............. 47, 48

*United States v. Rowson*, 652 F. Supp. 3d 436 (S.D.N.Y. 2023) .................. 19, 26, 48

*United States v. Salerno*, 481 U.S. 739 (1987) ................................... 48, 55

*United States v. Scott*, 450 F.3d 863 (9th Cir. 2006) .............................. 48

*United States v. Smith*, 2023 WL 3012007 (S.D. Ga. Mar. 29, 2023) ................... 19

*United States v. Spilotro*, 786 F.2d 808 (8th Cir. 1986) .......................... 48

*United States v. Stambaugh*, 641 F. Supp. 3d 1185 (W.D. Okla. 2022) ............. *passim*

*United States v. Stevens*, 559 U.S. 460 (2010) ....................................... 32

*United States v. Ware*, 673 F. Supp. 3d 947 (S.D. Ill. 2023) ..................... 37

*United States v. Williams*, 2024 WL 731932 (E.D. Mich. Feb. 22, 2024) .............. 36

*Worth v. Jacobson*, _____ F.4th _____, 2024 WL 3419668
    (8th Cir. July 16, 2024) ..................................................... 20, 22, 46

## Federal Statutes

18 U.S.C. § 922(g)(8) ........................................................*passim*

18 U.S.C. § 922(n) ..........................................................*passim*

18 U.S.C. § 3142(f) ..............................................................54

18 U.S.C. § 3145(c) ..............................................................55

18 U.S.C. § 3231 ..................................................................3

28 U.S.C. § 1291 ..................................................................3

Judiciary Act of 1789 ........................................................ 47, 50

## State Rules and Statutes

Ariz. R. Crim. P. 4.2(a)(6)-(8) ................................................................42

Ariz. R. Crim. P. 7.2(a) ..........................................................................42

Ariz. R. Crim. P. 7.3(a) ..................................................................... 42, 43

Ariz. R. Crim. P. 7.3(d)(1)(C) ........................................................... 42, 43

Ariz. Rev. Stat. Ann. § 13-702(D) ..........................................................4

Ariz. Rev. Stat. Ann. § 13-707(A)(1) .......................................................4

Ariz. Rev. Stat. Ann. § 13-2512(B) ..........................................................4

Ariz. Rev. Stat. Ann. § 13-3102 ......................................................... 4, 41

Ariz. Rev. Stat. Ann. § 13-3967(B) ................................................... 42, 43

Ariz. Rev. Stat. Ann. § 2508 ....................................................................4

## Constitutional Provisions

U.S. Const., amend. I....................................................................*passim*

U.S. Const., amend. II ..................................................................*passim*

U.S. Const., amend. IV .................................................................*passim*

U.S. Const., amend. V ..................................................... 28, 48, 54

U.S. Const., amend. IX .......................................................................20

## Other Sources

Don B. Kates, Jr., *The Second Amendment: A Dialogue,* Law & Comtemp.
    Probs., Winter 1986 ...............................................................40

Donald B. Verrilli, Jr., *The Eighth Amendment and the Right to Bail: Historical Perspectives*, 82 Colum. L. Rev. 328 (1982) ..................................................50

Evan Shapiro, *Section 3142(e) of the 1984 Bail Reform Act: Rebuttable Presumption or Mandatory Detention?*, 35 Buff. L. Rev. 693 (1986)...............49

Lauryn P. Gouldin, *Disentangling Flight Risk from Dangerousness*, 2016 B.Y.U. L. Rev. 837 (2016)....................................................49

Matthew J. Hegreness, *America's Fundamental and Vanishing Right to Bail*, 55 Ariz. L. Rev. 909 (2013)................................................. 47, 50

Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous"*, 25 Tex. Rev. L. & Pol. 245 (2021) ...................................................... 51

Shima Baradaran, *Restoring the Presumption of Innocence*, 72 Ohio St. L.J. 723 (2011) ...................................................49

William F. Duker, *The Right to Bail: A Historical Inquiry*, 42 Alb. L. Rev. 33 (1977) ...................................................49

**Introduction**

Police officers in Phoenix, Arizona, stopped a car being driven by Brandon Jackson, searched the trunk, and discovered a rifle with a 10.5-inch barrel. Although the rifle belonged to Jackson's passenger, an Arizona grand jury indicted Jackson for "misconduct involving weapons"—i.e., possessing and transporting his passenger's firearm. At detention hearings in Arizona state court, two separate judges both determined Jackson was not a danger to the community, and they therefore released him on his own recognizance without prohibiting him from possessing firearms. The misconduct-involving-weapons charge was eventually dismissed. But, 14 months after indictment, while that felony charge was still pending, Jackson drove from Arizona to Maryland, carrying with him a different firearm (a handgun) that he had obtained lawfully. After Maryland police officers found Jackson in possession of that gun, he was charged in federal court with transporting a firearm while under indictment for a felony, in violation of 18 U.S.C. § 922(n). He unsuccessfully moved to dismiss on the ground that § 922(n), as applied to him, violates the Second Amendment "right of the people to keep and bear Arms."

Applying the two-step test articulated in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), this Court should reverse. At *Bruen*

1

step one, which considers the Second Amendment's "plain text," Jackson is an American citizen and therefore among "the people" who enjoy the right to keep and bear arms. At *Bruen* step two, the government and the district court failed to establish that § 922(n), as applied to Jackson, squares with America's "historical tradition of firearm regulation." The traditions on which the district court relied—laws supposedly disarming "dangerous" groups, pretrial detention of indictees, and Founding-era surety laws—are not sufficiently analogous to § 922(n) in terms of how and why they burden the right to keep and bear arms. Specifically, none of the court's sources shows that Congress can disarm someone like Jackson, who had been indicted for—but not convicted of—a subsequently-dismissed nonviolent crime, and whom neutral judicial officers had found to be *not* dangerous.

The federal indictment against Jackson should have been dismissed.[1]

---

[1] Unless otherwise indicated, quotations in this brief omit citations, brackets, internal quotation marks, and other characters that do not affect the meaning of the cited language.

2

## Jurisdictional Statement

The district court had jurisdiction over this criminal case under 18 U.S.C. § 3231. The court entered judgment on February 2, 2024, J.A.396, and Jackson filed a notice of appeal on February 5, 2024, J.A.402. This Court's jurisdiction arises under 28 U.S.C. § 1291.

## Issue Presented

Whether 18 U.S.C. § 922(n) violates the Second Amendment as applied to Jackson.

## Statement of the Case

### A.    Proceedings in Arizona state court

On December 4, 2020, the Phoenix Police Department cited Jackson for hindering prosecution and resisting arrest, in connection with a protest at the Arizona State Capitol. *See* J.A.60, J.A.68, J.A.184, J.A.303. Jackson made an initial appearance on those charges the next day in Maricopa County Superior Court. J.A.73. At the conclusion of the hearing, a judge released Jackson on his own recognizance, subject to various conditions, e.g., that he not "initiate contact with the arresting officers." J.A.60. The judge did not impose a condition prohibiting Jackson from possessing, purchasing, transporting, or otherwise engaging in conduct involving firearms. J.A.60.

3

On December 8, 2020, a Phoenix Police Department officer swore out a complaint against Jackson in Maricopa County Superior Court, based on the same conduct underlying the earlier citation. J.A.56-59. Those charges were subsequently dismissed when, on January 28, 2021, an Arizona state grand jury returned an indictment charging Jackson with one count of hindering prosecution in the first degree, one count of misconduct involving weapons, and one count of passively resisting arrest. J.A.62-64, J.A.68. Under Arizona law, first-degree hindering prosecution is a class 5 felony, ordinarily punishable by up to two years' incarceration, *see* Ariz. Rev. Stat. Ann. §§ 13-2512(B), 13-702(D); misconduct involving weapons is a class 4 felony, ordinarily punishable by up to three years' incarceration, *see id.* §§ 13-3102(M), 13-702(D); and passively resisting arrest is a class 1 misdemeanor, punishable by no more than six months in jail, *id.* §§ 13-2508(A)(3), (B), 13-707(A)(1).

The misconduct-involving-weapons count—which later formed the basis for Jackson's § 922(n) charge—alleged Jackson "knowingly did manufacture, possess, transport, sell, or transfer" a "prohibited weapon," namely, a rifle with a 10.5-inch barrel. J.A.63. Police discovered the rifle in the trunk of a car being driven by Jackson and another man, Wesley Temple, which officers stopped for a traffic infraction. *See* J.A.57, J.A.173. The weapon did not belong to Jackson, but was

4

instead owned by Temple, who subsequently pled guilty in Arizona state court to possessing the firearm. *See* J.A.173.

On February 4, 2021, Jackson was arraigned on the indictment in Maricopa County Superior Court. J.A.75-80. A judge—different from the judge at Jackson's December 5th initial appearance—again released Jackson on his own recognizance, subject to the same conditions imposed previously. J.A.72, J.A.75-76.

In May 2022, state prosecutors dismissed all charges against Jackson. J.A.68. The state subsequently re-indicted Jackson for hindering prosecution and passively resisting arrest, but not for misconduct involving weapons. J.A.371-372.

## B.    Proceedings in the District of Maryland

### 1.    Arrest and indictment

Sometime in February 2022, while the Arizona indictment was still pending, Jackson drove from Phoenix to Maryland to participate in a political protest. *See* J.A.303. He carried with him a handgun that he had previously purchased lawfully. J.A.303.

On March 24, 2022, the Maryland State Police received a report that a vehicle was blocking the entrance and exit to the Hagerstown Speedway in Hagerstown, Maryland. J.A.17. Officers responded to the Speedway and encountered Jackson, who was upset that security personnel associated with the protest had been removing people from the Speedway. J.A.17. In the course of the

5

ensuing conversation, officers asked Jackson whether he had any firearms on his

person, and Jackson responded that he had a 9mm handgun. J.A.17. When officers

asked whether he was carrying the handgun legally, Jackson acknowledged he did

not have a permit to carry in Maryland. J.A.17. Officers eventually detained

Jackson, searched his person, and found a Smith and Wesson M&P in a holster on

his thigh. J.A.18. Jackson was placed under arrest. J.A.18.

On April 14, 2022, a federal grand jury in the District of Maryland returned a

one-count indictment charging Jackson under 18 U.S.C. § 922(n). J.A.22. Relevant

here, that statute forbids "any person who is under indictment for a crime

punishable by imprisonment for a term exceeding one year to ship or transport in

interstate or foreign commerce any firearm." § 922(n). The indictment alleged

that, while under indictment for misconduct involving weapons in Maricopa

County Superior Court, Jackson "did willfully ship and transport in interstate

commerce from Arizona to Maryland a firearm, that is, a Smith & Wesson Shield

9mm handgun." J.A.22.

### 2.   Motion to dismiss the indictment

On November 16, 2022, Jackson moved to dismiss the indictment. J.A.25.

He argued that, under the Supreme Court's opinion in *Bruen*, § 922(n) violated the

Second Amendment. J.A.25-26, J.A.53-55. As the motion explained, *Bruen*

announced a new two-part test for assessing Second Amendment challenges.
J.A.29-31. Courts begin by asking whether "the Second Amendment's plain text
covers an individual's conduct." *Bruen*, 597 U.S. at 17. If so, then a statute
proscribing that conduct is presumptively unconstitutional, and the government
can rebut the presumption only by showing that the statute "is consistent with this
Nation's historical tradition of firearm regulation." *Id.*

At *Bruen* step one, Jackson argued that the conduct charged in the
indictment, i.e., "transport[ing]" a handgun from Arizona to Maryland, qualified
as "keep[ing]" "Arms" and therefore came within the Second Amendment's plain
text. J.A.35. He also contended that, as an American citizen, he was among "the
people" protected by that text. J.A.35-41. At *Bruen* step two, Jackson asserted the
government would be unable to carry its burden of identifying Founding-era
regulations sufficiently similar to § 922(n). J.A.43-53. Finally, Jackson argued that
even if § 922(n) was constitutional on its face, it violated the Second Amendment
as applied because any supposed historical tradition that might support the
statute's facial constitutionality—e.g., laws disarming "dangerous" groups—had
no relevance to his case. J.A.53-55.

The government's response did not appear to dispute that Jackson was a

member of "the people." J.A.85-87.[2] But the government asserted the Second

Amendment's plain text "does not cover Jackson's conduct because § 922(n) ...

does not prohibit *possession* of a weapon," but merely "transport." J.A.86-87

(emphasis added). At *Bruen*'s second step, the government claimed § 922(n) was

consistent with three supposed historical traditions of firearms regulation: (1) laws

"categorically restricting the gun rights of groups viewed by legislatures as

unvirtuous or dangerous"; (2) "the longstanding tradition of restricting the rights,

including gun rights, of those charged with serious crimes"; and (3) "the surety

laws discussed in *Bruen*." J.A.87-91. The government did not respond to the as-

applied portion of Jackson's challenge.

### 3.    District court's denial of Jackson's motion

On March 13, 2023, the district court issued an opinion denying Jackson's

dismissal motion. J.A.260-294.

Interpreting the Second Amendment's "plain text," the district court

suggested "the people" may refer only to "law-abiding, responsible citizens," a

category that excludes those indicted for felonies. *See* J.A.268-275. But the court

found it unnecessary to decide that question, and instead "assume[d], *arguendo*,

---

[2] Indeed, during a hearing on Jackson's motion, the government conceded he
is among "the people." J.A.192.

8

that Jackson is among 'the people' to whom the Second Amendment applies, despite his status as an indictee." J.A.276. The court also appeared to hold that "transport[ing]" a firearm qualifies as "keep[ing]" arms for plain-text purposes. *See* J.A.268.

Moving to *Bruen*'s second step, the court held § 922(n) is facially constitutional because it is consistent with three American traditions of firearms regulation. J.A.291-293. First, the court posited a tradition of "limiting or prohibiting access to firearms by specific groups in the interest of public safety," i.e., "group[s] of persons defined by an objective characteristic that is a fair proxy for dangerousness." J.A.291.

Second, the court concluded "the historical tradition of sometimes detaining defendants charged with serious crimes supports restricting their Second Amendment rights while under indictment." J.A.291. The court noted that an indictee can be detained pending trial, which "strips a defendant of all Second Amendment rights" while he is in jail. J.A.291-292. "If an indictment is constitutionally sufficient to trigger a complete prohibition on a defendant's Second Amendment rights, because of pre-trial detention," the court reasoned, "then it must also be sufficient to temporarily restrict the right to acquire or transport arms while a felony indictment is pending." J.A.292.

Third, the court analogized § 922(n) to "surety statutes," which the court characterized as "limit[ing] the rights of a discrete group of people ... for the purpose of public safety." J.A.292.

Finally, the court rejected Jackson's as-applied challenge in one paragraph. J.A.293-294. The court did not explain its reasons for doing so, except to say that it viewed as irrelevant the fact that Jackson's misconduct-involving-weapons charge was eventually dismissed. *See* J.A.293-294.

### 4.    Guilty plea and sentencing

Jackson pled guilty in a conditional plea agreement that preserved his ability to appeal the denial of his dismissal motion. J.A.295-304. On February 2, 2024, the district court sentenced Jackson to time served, followed by three years of supervised release. J.A.10, J.A.397-398. Jackson filed a notice of appeal three days later. J.A.402.

### Summary of the Argument

Section 922(n) violates the Second Amendment as applied to Jackson.

At *Bruen* step one, Jackson comes within the Second Amendment's "plain text." The handgun he transported is an "Arm" for Second Amendment purposes, and transporting it in Jackson's car qualifies as "keep[ing]" and "bear[ing]" that arm. In addition, Jackson is an American citizen and, therefore, a member of "the

10

people." Contrary to the district court's suggestion, nothing in the Second Amendment's text differentiates between "law-abiding, responsible citizens" and other Americans. That supposed distinction is rooted in stray language in *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570 (2008), neither of which addressed the rights of (supposedly) non-law-abiding or irresponsible citizens. And as the Supreme Court recently made clear in *United States v. Rahimi*, 144 S. Ct. 1889 (2024), prior opinions' references to "law-abiding, responsible citizens" were not meant to limit the Second Amendment's scope.

At *Bruen*'s second step, the sources cited by the government and the district court do not establish that § 922(n) can constitutionally be applied to Jackson.

1. *Bruen* and *Rahimi* leave no doubt that "dangerousness" is far too broad and vague a metric for deciding who can and cannot exercise Second Amendment rights. In any event, the district court's sources do not establish, as a historical matter, that America has a tradition of disarming purportedly "dangerous" groups. And even if such a tradition did exist, the government failed to show that Jackson—who was indicted for a subsequently-dismissed nonviolent crime, and whom two separate judges found to pose no threat to the community— was dangerous.

2. Founding-era pretrial detention is irrelevant to Jackson's as-applied

challenge, since he was released, not detained, pending trial in Arizona. And anyway, pretrial detention and § 922(n) disarm indictees for different reasons and in different ways. Pretrial detention at the Founding was intended *exclusively* to prevent flight, not to ensure community safety, whereas § 922(n) serves only the latter purpose. And while pretrial detention disarms an indictee based on an individualized, adversarial, evidence-based determination of dangerousness, § 922(n) deprives indictees of firearms without any inquiry into whether they in fact threaten others' safety.

3.    As for surety statutes, they too required an individualized, adversarial, evidence-based determination of dangerousness before an accused could be disarmed, and they contained an exception for self-defense. Section 922(n) has none of those features.

## Argument

### I.    Section 922(n) violates the Second Amendment as applied to Jackson.

#### A.    Standard of review

This Court reviews de novo a Second Amendment challenge to a federal statute. *United States v. Chapman*, 666 F.3d 220, 224 (4th Cir. 2012).

### B.    Legal background

#### 1.    Before *Bruen*, lower courts assessed Second Amendment challenges through a deferential form of means-ends balancing.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In *Heller*, the Supreme Court held the Second Amendment codifies a preexisting individual right to possess firearms for lawful purposes like self-defense. 554 U.S. at 592.

Following *Heller*, lower courts developed a two-step inquiry for deciding Second Amendment challenges. Courts began by "ask[ing] whether the challenged law impose[d] a burden on conduct falling within the scope of the Second Amendment's guarantee as historically understood." *Chapman*, 666 F.3d at 225. If not, the challenge failed. *Id.* But if the statute did burden Second Amendment conduct, courts then "appli[ed] the appropriate form of means-end scrutiny"—either strict or intermediate. *Id.* Both forms of scrutiny involved weighing the governmental interest in firearm restrictions against the challenger's interest in keeping and bearing arms. *See United States v. Hosford*, 843 F.3d 161, 168 (4th Cir. 2016).

As applied in the decade and a half following *Heller*, this two-part test had little bite. Lower courts would typically "assume without deciding" that a

13

challenged statute burdened conduct within the scope of the Second Amendment. *Harley v. Wilkinson*, 988 F.3d 766, 769 (4th Cir. 2021); *see also, e.g.*, *United States v. Chester*, 628 F.3d 673, 681-82 (4th Cir. 2010); *United States v. Mahin*, 668 F.3d 119, 124 (4th Cir. 2012).

Then, at step two, courts would apply a highly deferential form of means-ends scrutiny, almost invariably "deferring to the legislature's conclusion" that a particular law's infringement on Second Amendment rights was "outweigh[ed]" by its "public safety" benefits. *Rogers v. Grewal*, 140 S. Ct. 1865, 1867 n.1 (2020) (Thomas, J., joined by Kavanaugh, J., dissenting from denial of certiorari). The government's "public safety arguments" were frequently "accepted ... with no serious probing." *New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1544 (2020) (Alito, J., joined by Gorsuch, J., dissenting). Adopting such a "high degree of deference" to legislatures, *Peruta v. Cty. of San Diego*, 742 F.3d 1144, 1177 (9th Cir. 2014), *vacated by reh'g en banc*, "allow[ed] courts to feign respect to the right to keep and bear arms while rarely ever actually using it to strike down a law," *Duncan v. Bonta*, 19 F.4th 1087, 1147 (9th Cir. 2021) (en banc) (Bumatay, J., dissenting). By "deferring absolutely" to legislatures' "predictive judgments," courts effectively "insulated" firearms regulations "from meaningful judicial review." *Drake v. Filko*, 724 F.3d 426, 456-57 (3d Cir. 2013) (Hardiman, J.,

14

dissenting); *see also Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N.J.*, 910 F.3d 106, 131 (3d Cir. 2018) (Bibas, J., dissenting) (criticizing majority for "reflexively defer[ring]" to government's "predictive judgments").

> ### 2.    *Bruen* rejected deference to legislatures in favor of "text and history."

The Supreme Court rejected the lower courts' approach in *Bruen*. Post-*Heller* litigation, in the Court's view, had demonstrated that "federal courts tasked with making ... difficult empirical judgments regarding firearm regulations under the banner of intermediate scrutiny often defer[red] to the determinations of legislature." *Bruen*, 597 U.S. at 25. But, the Court wrote, "while that judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here," in the Second Amendment context. *Id.* at 26. That is because the Second Amendment "is the very *product* of an interest balancing by the people," and it is that "balance—struck by the traditions of the American people—that demands our unqualified deference." *Id.* (emphasis in original). Therefore, the Court wrote, deciding Second Amendment challenges through interest-balancing is neither "administrable" nor "legitimate." *Id.* at 25.

*Bruen* directed courts, instead, to apply a two-step "text-and-history test" to Second Amendment claims. *Id.* at 25 n.6. Courts should begin by asking, at step

one, whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 17. If not, the challenge fails. But if the conduct does fall within the Second Amendment's plain text, then "the Constitution presumptively protects that conduct." *Id.* A statute proscribing such conduct is unconstitutional unless the government, at step two, "demonstrate[s] that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* The "burden falls on [the government] to show" that a statute fits within America's tradition of firearms regulation. *Id.* at 33-34. To carry that burden, the government must point to "historical precedent" that "evinces a comparable tradition of regulation," i.e., a body of firearm regulations "analogous" to the one being challenged. *Id.* at 27, 30. If "no such tradition" exists, the statute is unconstitutional. *Id.*

To determine whether a challenged statute is analogous to historical precursors, courts should consider two primary metrics: "how and why" the regulations burden the right to armed self-defense. *Id.* at 29. That is, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense [i.e., the 'how'] and whether that burden is comparably justified [i.e., the 'why'] are central considerations when engaging in an analogical inquiry." *Id.* (emphasis omitted). A firearms regulation is unconstitutional unless it is analogous to historical precursors along both these dimensions. *See Rahimi*, 144 S.

16

Ct. at 1898.

*Bruen* admonished courts to be neither too demanding nor too permissive when drawing these comparisons. As the Court put it, "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Bruen*, 597 U.S. at 30. The government need only identify a "historical *analogue*, not a historical *twin*" or a "dead ringer." *Id.* (emphasis in original). At the same time, "courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted." *Id.* And all doubts must be resolved in favor of the Second Amendment claimant. "To the extent there are multiple plausible interpretations" of the historical record, courts should "favor the one that is more consistent" with "the Second Amendment's unqualified command." *Id.* at 24, 44 n.11.

The Supreme Court warned lower courts, as well, that they may not "engage in independent means-end scrutiny under the guise of an analogical inquiry." *Id.* at 29 n.7. *Bruen*'s historical inquiry "requires judges to apply faithfully the balance struck by the founding generation to modern circumstances," and courts are not free to "revise that balance through means-end scrutiny" masquerading as history. *Id.*

Applying this two-step test in *Bruen*, the Court struck down a New York law providing that, to obtain a permit to carry a concealed handgun in public, an applicant had to demonstrate "proper cause," i.e., "a special need for self-protection distinguishable from that of the general community." *Id.* at 12. At step one, the Court noted it was "undisputed" that the petitioners were "part of 'the people' whom the Second Amendment protects," and that handguns are "Arms" for Second Amendment purposes. *Id.* at 31-32. The Court also "ha[d] little difficulty concluding" that the petitioners' "proposed course of conduct—carrying handguns publicly for self-defense"—qualifies as "bear[ing] arms." *Id.* at 32. The Second Amendment therefore "presumptively guarantee[d]" a right to carry firearms in public, and New York's proper-cause requirement, which infringed that right, could pass constitutional muster only if the state overcame the presumption. *Id.* at 33-34. At step two, the Court held that because New York had failed to identify a robust historical tradition of regulations similar to the proper-cause requirement, the state's statute violated the Second Amendment. *Id.* at 33-70.

### C. Discussion

#### 1. Jackson is covered by the Second Amendment's plain text.

"Step one of *Bruen* asks the threshold question whether the Second Amendment's plain text covers (1) the individual, (2) the type of arm, and (3) the

proposed course of conduct that are at issue." *United States v. Duarte*, 101 F.4th 657, 670-71 (9th Cir. 2024), *vacated by reh'g en banc*. Jackson satisfies all three requirements.

There was no dispute in district court that the firearm Jackson transported, a 9mm handgun, is protected. *See Heller*, 554 U.S. at 629 (holding handguns constitute "Arms").

Below, the government suggested "transport[ing]" and "ship[ping]" do not qualify as "keep[ing]" or "bear[ing]" arms. J.A.86-87. This argument is without merit. The Supreme Court has defined "keep" as "to retain; not to lose," "to have in custody," and "to hold; to retain in one's power or possession"—in short, to "have weapons." *Id.* at 581. And it has defined "bear" as to "wear" or "carry" firearms "upon the person or in the clothing or in a pocket." *Bruen*, 597 U.S. at 32. Transporting a firearm in a car satisfies both these definitions. Consistent with the words' ordinary meaning, numerous courts entertaining § 922(n) challenges have recognized that transporting and shipping a firearm fall within the Second Amendment's plain text. *See, e.g.*, *United States v. Rowson*, 652 F. Supp. 3d 436, 459 (S.D.N.Y. 2023); *United States v. Smith*, 2023 WL 3012007, at *3 (S.D. Ga. Mar. 29, 2023); *Alexander v. United States*, 686 F. Supp. 3d 608, 619 (W.D. Mich. 2023).

Finally, Jackson is one of "the people." *Heller* said "the people"

"unambiguously refers to *all* members of the political community, *not an unspecified subset.*" 554 U.S. at 580 (emphasis added). It interpreted "the people" to refer to all "persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id.* Thus the Second Amendment right, *Heller* held, "belongs to *all* Americans." *Id.* at 581 (emphasis added). *Bruen* reaffirmed this conclusion, holding the Second Amendment protects "all Americans." 597 U.S. at 70. As an American citizen, Jackson is therefore among "the people" entitled to Second Amendment rights. *See Duarte*, 101 F.4th at 672-73 ("Our own analysis of the Second Amendment's text, as informed by its history, confirms that 'the people' included, at a minimum, all American citizens—without qualification.").

In addition, *Heller* explained that "the people" is a "term of art" that bears a uniform meaning across the First, Second, Fourth, and Ninth Amendments. 554 U.S. at 580. It follows that if a felony indictment removes someone from "the people" for Second Amendment purposes, it must also remove him from "the people" for First and Fourth Amendment purposes. After all, an "inconsistent reading" of "the people" would violate the Supreme Court's admonition that the right to bear arms is not "'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Worth v. Jacobson*, ____ F.4th

20

____, 2024 WL 3419668, at *5-8 (8th Cir. July 16, 2024) (holding "the people"
includes all American citizens, even convicted felons). The result is that anyone
indicted for a felony would have no First Amendment right "peaceably to
assemble, and to petition the Government for a redress of grievances" and no
Fourth Amendment right "to be secure in [his] persons, houses, papers, and
effects, against unreasonable searches and seizures."

This Court should reject that untenable proposition. *See, e.g.*, *Range v. Att'y
Gen.*, 69 F.4th 96, 102 (3d Cir. 2023) (en banc) ("Unless the meaning of the phrase
'the people' varies from provision to provision—and the Supreme Court in *Heller*
suggested it does not—to conclude that Range is not among 'the people' for
Second Amendment purposes would exclude him from those rights as well."),
*certiorari granted, judgment vacated sub nom. Garland v. Range*, ____ S. Ct. ____,
2024 WL 3259661 (U.S. July 2, 2024); *United States v. Johnson*, 2023 WL 6690388,
at *3 (N.D. Ill. Oct. 12, 2023) (noting Framers' "consistent use" of "the people"
throughout Bill of Rights, and reasoning that since felons are among "the people"
for First and Fourth Amendment purposes, they qualify for Second Amendment
purposes, too).

Notwithstanding this straightforward interpretation of the Second
Amendment's plain text, the district court suggested "the people" may comprise

only *law-abiding* and *responsible* people. *See, e.g.*, J.A.264-265. This argument

primarily relies, not on the Second Amendment's text, but on stray language in

prior Supreme Court opinions. In *Heller*, the Court wrote that "whatever else [the

Second Amendment] leaves to future evaluation, it surely elevates above all other

interests the right of law-abiding, responsible citizens to use arms in defense of

hearth and home." 554 U.S. at 635. Likewise, *Bruen* at times referred to the

petitioners in that case as "law-abiding, responsible citizens." *E.g.*, 597 U.S. at 70.

Based on these passages, the district court surmised that "the people" in the

Second Amendment may exclude anyone who is *not* law-abiding and responsible.

*See* J.A.269-272. And because felony indictees, in the district court's view, are non-

"law-abiding," the court proposed that § 922(n) defendants may not fall within the

Second Amendment's plain text. *See* J.A.273-275.

There are at least two problems with this line of reasoning. *See Worth*, 2024

WL 3419668, at *6 (rejecting this "extratextual" argument).

>   a.    ***Rahimi* rejected attempts to limit Second Amendment coverage to "law-abiding, responsible citizens."**

To begin, the Supreme Court in *Rahimi* rejected the "law-abiding,

responsible citizens" gloss on the Second Amendment. That case involved a

challenge to 18 U.S.C. § 922(g)(8), which prohibits firearm possession by people

subject to domestic-violence restraining orders. *Rahimi*, 144 S. Ct. at 1894. Citing

22

the same passages on which the district court relied in this case, the government in *Rahimi* argued the Supreme Court had already held that legislatures may disarm anyone who is not "law-abiding" or "responsible." *See, e.g.*, *United States v. Rahimi*, No. 22-915, Gov't Br. 6 ("As this Court recognized in [*Heller*], and reiterated in [*Bruen*], the Second Amendment allows Congress to disarm persons who are not law-abiding, responsible citizens."); *id.* at 11 ("[T]his Court's precedents have recognized that Congress may disarm individuals who are not 'law-abiding, responsible citizens.'" (quoting *Heller*, 554 U.S. at 635)).

The government further contended that, in the Second Amendment context, "not responsible" is simply a synonym for "dangerous," since "a person is not 'responsible' if his possession of a firearm would pose a danger of harm to himself or others." *Id.* at 27. Therefore, the government argued, § 922(g)(8) is constitutional because it accords with America's tradition of disarming dangerous groups: "Because persons who are subject to domestic-violence protective orders pose an obvious danger to others, they are not 'responsible' individuals, and the Second Amendment allows Congress to disarm them." *Id.* at 29.

Although it upheld § 922(g)(8)(C)(i) on other grounds, the Supreme Court "reject[ed] the Government's contention that Rahimi [could] be disarmed simply because he [wa]s not 'responsible.'" *Rahimi*, 144 S. Ct. at 1903. As the Court

23

explained, the responsible/irresponsible "line" does not "derive from our case law." *Id.* Although *Heller* and *Bruen* "used the term 'responsible' to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right," those opinions "said nothing about the status of citizens who were not 'responsible.'" *Id.* That "question was simply not presented" in *Heller* or *Bruen*. *Id.* In addition, the Court wrote, "'[r]esponsible' is a vague term" that cannot demarcate the bounds of the Second Amendment, since "[i]t is unclear what such a rule would entail." *Id.*

*Rahimi* dooms any attempt to limit "the people" to "responsible" citizens. And what is true of "responsible" is equally true of "law-abiding," the second half of the district court's proposed limitation. *Rahimi* did not specifically address the "law-abiding" portion of the government's argument because the government in *Rahimi* did not claim § 922(g)(8) was justified by Congress' power to disarm the non-"law-abiding." Instead, the government relied only on a (purported) government power to deny firearms to those who are not "responsible." *See Rahimi* Gov't Br. 27-29 (arguing § 922(g)(8) defendants are "not 'responsible'" and suggesting, by contrast, that felons and illegal immigrants are not "law-abiding"). But both prongs of the government's proposed test—"responsible" and "law-abiding"—derive from the same source: *Heller*'s and *Bruen*'s use of those

words to describe the challengers in those cases. And just as the "responsible" question "was simply not presented" in *Heller* or *Bruen*, those cases did not address the "law-abiding" question either. *Rahimi*, 144 S. Ct. at 1903. Thus, a "law-abiding"/non-"law-abiding" line does not "derive from [the Supreme Court's] case law." *Id.*

The term "law-abiding," moreover, is every bit as "vague" and "unclear" as the term "responsible." *Id.* Neither provides a coherent, workable metric for deciding who is and is not among "the people." *See, e.g.*, *Range*, 69 F.4th at 102 ("[T]he phrase 'law-abiding, responsible citizens' is as expansive as it is vague."); *United States v. Coleman*, 2023 WL 6690935, at *6 (E.D. Va. Oct. 12, 2023) ("A phrase that malleable cannot be the peg that the Court references to determine who falls within or beyond the protections guaranteed by the Constitution.").

Even before *Rahimi*, numerous courts recognized they could not restrict the Second Amendment's scope based on *Heller*'s and *Bruen*'s "scattered references to 'law-abiding' and 'responsible' citizens." *Duarte*, 101 F.4th at 670. The "criminal histories of the plaintiffs in *Heller* ... and *Bruen* were not at issue in those cases," *Range*, 69 F.4th at 101, and it is therefore "inconceivable" that "the Supreme Court, without any textual or historical analysis of the Second Amendment, intended to decide the constitutional fate of so large a population in

25

so few words and with such little guidance," *Duarte*, 101 F.4th at 670; *see also, e.g.*, *United States v. Lewis*, 682 F. Supp. 3d 1038, 1048 (S.D. Ala. 2023) ("*Bruen* [did not] purport[] to confine the Second Amendment to law-abiding, responsible citizens. It had no need, and perhaps no ability, to issue such a holding, since the individual plaintiffs were undisputedly 'ordinary, law-abiding' adult citizens."); *United States v. Pierre*, No. 1:22-cr-20321-JEM, ECF 53 at 17 (S.D. Fla. Nov. 28, 2022) ("[I]t is no surprise that [*Bruen*] used the term 'law-abiding' because that was the factual scenario the Court was considering. Indeed, there would have been no reason for the Court in *Bruen* to address or even consider whether non-law-abiding citizens were part 'of the people.' It did not, and *Bruen*'s references to 'law abiding' do not support the Government's position.").

Recognizing that a "law-abiding, responsible citizens" filter is atextual, every court to consider a § 922(n) challenge post-*Bruen* has either held or assumed that felony indictees are among "the people." This Court should do the same. *See, e.g.*, *United States v. Kays*, 624 F. Supp. 3d 1262, 1265-66 (W.D. Okla. 2022); *Rowson*, 652 F. Supp. 3d at 457-63; *United States v. Gore*, 2023 WL 2141032, at *2 (S.D. Ohio Feb. 21, 2023); *Alexander*, 686 F. Supp. 3d at 618-19; *United States v. Reaves*, No. 4:22-cr-224-HEA, ECF 55 at 15-16 (E.D. Mo. Jan. 9, 2023).

> **b.    Alternatively, felony indictees cannot be deemed non-"law-abiding."**

Even if "the people" is limited to "law-abiding" (or "responsible")

citizens, Jackson—as someone merely under indictment—fell within that category.

For starters, a "person under indictment is presumed innocent and, until

conviction, is not guilty of the charge that triggers the application of § 922(n)."

*United States v. Call*, 874 F. Supp. 2d 969, 977 (D. Nev. 2012). "[D]eeming those

indicted for felonies 'non-law-abiding and dangerous' ... is at odds ... with the

presumption of innocence," a "bedrock principle of our system of criminal

justice." *United States v. Stambaugh*, 641 F. Supp. 3d 1185, 1189 (W.D. Okla.

2022); *see also United States v. Laurent*, 861 F. Supp. 2d 71, 102 (E.D.N.Y. 2011)

(holding that, in light of "presumption of innocence," indictment alone cannot

justify labeling someone non-"law-abiding").

Although a grand jury's probable-cause finding offers some minimal basis for

concluding a defendant may have broken the law, it cannot justify categorically

removing him from the ambit of the Second Amendment. "The probable cause

standard isn't a high one," imposing "a lesser burden than even the preponderance

of the evidence standard." *United States v. Darosa*, 102 F.4th 228, 233 (4th Cir.

2024). A grand jury need not even find the defendant's guilt is "more likely true

than false." *United States v. Ortiz*, 669 F.3d 439, 445 (4th Cir. 2012).

Perhaps more important, grand-jury proceedings are not "adversarial." *United States v. Hicks*, 649 F. Supp. 3d 357, 365 (W.D. Tex. 2023). An accused is "entitled to neither notice of, nor an opportunity to be heard at, grand jury proceedings, so [he] never has a chance to contest [his] Second Amendment-rights-depriving status as an indictee." *Stambaugh*, 641 F. Supp. 3d at 1192; *see also Laurent*, 861 F. Supp. 2d at 80 (when indicted, defendant "has not seen the evidence against him" or had "an opportunity to present his own version of events"). The grand-jury process is unreliable in other respects, too. The Supreme Court has held that "(1) the rules of evidence don't apply, (2) evidence barred by the Fourth Amendment's exclusionary rule may be heard, and (3) the grand jury may rely on evidence obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination." *United States v. Quiroz*, 629 F. Supp. 3d 511, 524 (W.D. Tex. 2022). And the grand jury "need not consider ... exculpatory evidence." *Laurent*, 861 F. Supp. 2d at 88.

In short, the grand-jury process "brings with it the potential for mistake and abuse." *Id.* at 89. Multiple courts have therefore recognized, in the Second Amendment context, that a grand-jury indictment is an insufficient basis for branding someone non-"law-abiding." *See, e.g.*, *id.* at 102; *Stambaugh*, 641 Supp. 3d at 1189; *Call*, 874 F. Supp. 2d at 977; *United States v. Bartucci*, 658 F. Supp. 3d

28

794, 800-02 (E.D. Cal. 2023); *Alexander*, 686 F. Supp. 3d at 618-19.

> **2.    The sources cited by the district court do not demonstrate that § 922(n) can constitutionally be applied to Jackson.**

The district court concluded § 922(n) is consistent with three strands of America's tradition of firearms regulation: (1) laws disarming "dangerous" groups, (2) pretrial detention of felony indictees, and (3) surety statutes. J.A.291-293. None of these traditions establishes that § 922(n) is constitutional as applied to Jackson.

### a.    Disarmament of "dangerous" groups

The district court's reliance on a (purported) tradition of disarming "dangerous" groups is misplaced for three independently sufficient reasons.[3]

> **i.    The Supreme Court has rejected reliance on "vague," excessively broad categories like "dangerous."**

The Supreme Court's Second Amendment cases do not permit disarmament based on a category as nebulous and indeterminate as "dangerous."

As explained above, the government argued in *Rahimi* that legislatures can disarm anyone who is "not responsible," by which it simply meant "dangerous." *E.g.*, *Rahimi* Gov't Br. 6-7, 11, 13, 27-29, 37. Rahimi objected that the government's

---

[3] The court's order also refers to such groups as "suspect groups." J.A.291. Because the court did not explain what "suspect" means or provide any examples of "suspect" groups, Jackson interprets that term to be synonymous with "dangerous."

29

"responsible" metric "admit[ted] to no true limiting principle and risk[ed] swallowing the text of the amendment." *United States v. Rahimi*, No. 22-915, Resp. Br. 35. Nevertheless, the government did not budge; at oral argument it confirmed that it was "using 'responsible' as a placeholder for dangerous with respect to the use of firearms." *United States v. Rahimi*, No. 22-915, Tr. of Oral Arg. 10. The government stressed that it was "not using the term 'not responsible' to describe colloquially anyone who you might describe as ... demonstrating irresponsibility." *Id.* at 9-10. Rather, the government believed "the principle of responsibility" was "intrinsically tied to the danger you would present if you have access to firearms." *Id.* at 10; *see also id.* at 11 (positing there was "no daylight at all ... between not responsible and dangerous").

It was *this* argument—i.e., dangerousness equals irresponsibility, which justifies disarmament—that the Supreme Court "reject[ed]" in *Rahimi*. 144 S. Ct. at 1903. And just as Rahimi had urged, the Court concluded the term "responsible" is too "vague" and "unclear" to delimit the bounds of the Second Amendment. *Id.* It follows that "dangerous"—the government's proffered definition of "responsible"—is too "vague" and "unclear" as well.

That conclusion is consistent with *Bruen*. There, the Court held the government must point to a "well-defined" historical tradition similar to the

30

challenged law. *See Bruen*, 597 U.S. at 38. And the Court rejected means-ends balancing, in part, because that approach was not "administrable." *Id.* at 25. But the term "dangerous" is far from well-defined, and it would be virtually impossible to administer. There is no commonly accepted understanding of what renders a person "dangerous," nor an obvious method for determining who is and is not dangerous. The term is so malleable, so capacious, that legislatures could use it to disarm just about any group they wished. *See Medina v. Whitaker*, 913 F.3d 152, 159-60 (D.C. Cir. 2019) (concluding "'dangerousness' standard" is too "amorphous ... to delineate the scope of the Second Amendment"); *Kanter v. Barr*, 919 F.3d 437, 465 (7th Cir. 2019) (Barrett, J., dissenting) ("The government could quickly swallow the [Second Amendment] right if it had broad power to designate any group as dangerous and thereby disqualify its members from having a gun.").

    *Bruen* also rejected New York's contention that the proper-cause requirement was tantamount to a "sensitive-places" law, in that it banned firearms only in "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available." 597 U.S. at 30-31. According to the Court, that definition of sensitive places was "far too broad[]" and "would eviscerate" the right to carry firearms publicly. *Id.* at 31. A "broad[]," pliable standard like "dangerous" would similarly "eviscerate" the right of armed

self-defense.

Similarly, *Bruen* explained that its "Second Amendment standard accords with how [the Court] protect[s] other constitutional rights," such as freedom of speech. *Id.* at 25. In particular, when a law restricts First Amendment conduct, "the Government bears the burden" of identifying "historical evidence" that shows a particular "type of speech belongs to a 'historic and traditional category' of constitutionally unprotected speech." *Id.* at 24-25 (quoting *United States v. Stevens*, 559 U.S. 460, 468-71 (2010)). And those categories of unprotected speech must be "well-defined and narrowly limited," rather than "highly manipulable." *Stevens*, 559 U.S. at 468-49, 472. Such categories need a "clear limiting principle," lest they justify restricting speech on "an endless list of subjects." *United States v. Alvarez*, 567 U.S. 709, 723 (2012). *Bruen*'s analogy to the First Amendment demonstrates that any Second Amendment categories must also be "well-defined and narrowly limited," subject to a "clear limiting principle." But a "dangerousness" test has no limiting principle at all, and is anything but narrowly limited or well-defined. "Dangerous" is instead a "manipulable" term that would permit legislatures to disarm American citizens at will.

Forced to apply such a murky standard, courts would be left with two options. First, they could defer to legislatures' views of dangerousness: if the

legislature considers a certain group to be "dangerous," then courts must respect that judgment. But *Bruen* expressly rejected "deference to legislative interest balancing." 597 U.S. at 26. Deferring to legislatures' "dangerousness" determinations would hand Congress a "regulatory blank check," authorizing laws that do not "remotely resemble[]" real-life historical analogues. *Id.* at 30. Second, courts could make their own judgments about what renders someone dangerous. *Bruen*, though, repudiated this kind of "judge-empowering interest-balancing inquiry." *Id.* at 22. Courts attempting to apply a freewheeling, ill-defined "dangerousness" standard would merely be "engag[ing] in independent means-end scrutiny under the guise of an analogical inquiry." *Id.* at 29 n.7.

As Justice Barrett cautioned in *Rahimi*, courts "must be careful not to read a principle at such a high level of generality that it waters down the right." 144 S. Ct. at 1926 (Barrett, J., concurring). A "dangerousness" test would do just that.

> ii.   **The sources cited by the district court do not establish a history of disarming "dangerous" groups.**

Even assuming a "dangerousness" test is conceptually coherent, the district court failed to establish that a tradition of disarming "dangerous" groups actually exists as a historical matter. In the portion of its opinion announcing its holding, the court did not cite a single historical regulation to substantiate such a tradition. J.A.291. Instead, it simply quoted previous cases and law-review articles for the

33

sweeping proposition that legislatures may disarm "dangerous" and "suspect" groups. J.A.291. This 30,000-foot-view kind of analysis does not comport with *Bruen* and *Rahimi*, which resolved Second Amendment challenges by examining discrete, real-world "regulations"—i.e., statutes and common-law offenses—that specifically proscribed firearm-related conduct. *Bruen*, 597 U.S. at 33-70; *Rahimi*, 144 S. Ct. at 1899-1902.

The district court may have been relying on sources the government cited to supports its "dangerousness" argument, *see* J.A.87-90, some of which the court catalogued elsewhere in its opinion, J.A.284-286. If so, those sources still fall well short of establishing a general "dangerousness" tradition.

*First,* the court noted that during the American Revolution, four states passed laws that "confiscated weapons owned by persons who refused to swear an oath of allegiance to the state or to the nation." J.A.284. These laws are a poor analogue for several reasons.

To start, the "disaffected" loyalists covered by these laws "could be disarmed *in toto* because they fell outside 'the people' and were therefore deemed to have no fundamental rights." *Duarte*, 101 F.4th at 682. "Since 'an individual's undivided allegiance to the sovereign' was a 'precondition' to his 'membership in the political community,' British Loyalists 'renounced' their place among 'the

34

[American] people' by refusing to swear a loyalty oath." *Id.* (quoting *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1048 (11th Cir. 2022)). The loyalty-oath statutes are therefore irrelevant, since "[l]aws applying to a group that was not protected by the right to armed self-defense cannot provide any insight into that right's scope." *United States v. Harrison*, 654 F. Supp. 3d 1191, 1220 (W.D. Okla. 2023).

The loyalty-oath statutes were also "short-lived" and "merely temporary"; they appear "not to have survived through the Founding in anything like their original form." *Duarte*, 101 F.4th at 681, 683. But *Bruen* held courts should afford "little weight" to "short lived" regulations, which are not part of "an *enduring* American tradition of state regulation." 597 U.S. at 69 (emphasis added).

In addition, states passed the loyalty-oath laws "during the darkest days of an existential domestic war between the newly formed republic and Great Britain." *Duarte*, 101 F.4th at 681. *Bruen*, however, disclaimed reliance on regulations enacted during times of "acute disorder" or "turmoil and rebellion," which may not "align with the Constitution's usual application during times of peace." *See* 597 U.S. at 40, 63 n.26.

The loyalty-oath statutes also are not "comparably justified" relative to § 922(n), at least in Jackson's case. *Id.* at 29. Those statutes were meant to disarm "political traitors" or "potential insurrectionists" who might "threaten[] violent

35

revolt" against the state. *United States v. Neal*, 2024 WL 833607, at *9 n.10 (N.D. Ill. Feb. 7, 2024); *see also United States v. DeBorba*, 2024 WL 342546, at *11-12 (W.D. Wash. Jan. 30, 2024) (explaining oath statutes disarmed loyalists because they were viewed as "political traitors" who "threaten[ed] the integrity of the United States" through "non-allegiance to the political community and potential for uprising"). That is "a radically different justification" from § 922(n)'s, i.e., to prevent interpersonal violence. *See United States v. Cousar*, 2024 WL 1406898, at *8 (D. Kan. Apr. 2, 2024). Here, Jackson's misconduct-involving-weapons indictment gives no reason to believe he was likely to engage in revolt or insurrection against the United States. The loyalty-oath statutes therefore do not provide a justification for disarming *Jackson*.

Finally, loyalty-oath statutes did not impose a "comparable burden on the right of armed self-defense" as § 922(n). *Bruen*, 597 U.S. at 29. Those statutes "exempted [people] who took the oath after previously refusing." *United States v. Williams*, 2024 WL 731932, at *17 (E.D. Mich. Feb. 22, 2024). The burden on the right to keep and bear arms was therefore negligible—a loyalist could regain that right anytime he wanted simply by swearing an oath. *Id.* at *21. By contrast, § 922(n) afforded Jackson "no similar opportunity" "to regain [his] rights." *United States v. Prince*, 2023 WL 7220127, at *9 (N.D. Ill. Nov. 2, 2023). In fact,

Jackson had no recourse at all in the year-plus between when he was indicted in Arizona state court and when he traveled to Maryland—nor for the multiple years after that when his state case remained pending. *See* J.A.371-372 (Arizona case still pending as of February 2024, three years after indictment).

*Second,* the government pointed to proposals from Pennsylvania's and Massachusetts' constitutional ratifying conventions, which would have codified a right to keep and bear arms, but with an exception for "danger[ous]" or non-"peaceable" citizens and those who "committed" "crimes." J.A.88-89. These proposals fare no better.

Most obviously, "none of the relevant limiting language made its way into the Second Amendment," and in fact, neither proposal even garnered a majority of votes at its respective state convention. *Kanter*, 919 F.3d at 455 (Barrett, J., dissenting). If anything, then, these proposals suggest the Second Amendment was *not* understood to embody an exception for anyone charged with a crime. *See United States v. Ware*, 673 F. Supp. 3d 947, 957 (S.D. Ill. 2023) ("The fact that language dispossessing criminals of their right to keep and bear arms was expressly contemplated, and then rejected shows that such a restriction was not in line with the original public meaning of the Second Amendment."); *Rahimi*, 144 S. Ct. at

37

1936 (Thomas, J., dissenting) (similar).[4]

More broadly, *Heller* warned that "[i]t is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process." 554 U.S. at 590. Indeed, the *Heller* majority scolded the dissent for consulting "the drafting history of the Second Amendment—the various proposals in the state conventions and the debates in Congress"—to interpret the amendment. *Id.* at 603. Reliance on such sources is "dubious," the majority wrote, because the Second Amendment "was widely understood to codify a pre-existing right, rather than to fashion a new one." *Id.*

Regardless, the government must identify "a well-established and *representative*" historical tradition, i.e., one rooted in more than a few "outlier[]" sources. *Bruen*, 597 U.S. at 30, 65 (emphasis added). The *Bruen* Court "doubt[ed] that *three* colonial regulations could suffice to show a tradition." *Id.* at 46 (emphasis in original). Yet the ratifying-convention theory relies on just two proposals. That is not enough. *See United States v. Bullock*, 679 F. Supp. 3d 501, 527-28 (S.D. Miss. 2023) (discounting convention proposals on this basis).

**Third,** the government and the district court alluded to a tradition that

---

[4] The *Rahimi* majority did not disagree with Justice Thomas on this point.

supposedly permitted legislatures to disarm "unvirtuous citizens." J.A.89-90,

J.A.284-285. But neither the government nor the district court identified even a

single historical regulation that dispossessed anyone of firearms based on a lack of

virtue. *See* J.A.89-90, J.A.284-285. And indeed, numerous courts have examined

the historical record and concluded no such laws existed. *See, e.g.*, *Koons v. Platkin*,

673 F. Supp. 3d 515, 570 (D.N.J. 2023) ("Like Judge Hardiman, then-Judge

Barrett, and Judge Bibas, this Court could not uncover any historical laws stripping

away an individual's right to keep and bear arms based on his or her virtue (or lack

thereof)."); *United States v. Melendrez-Machado*, 677 F. Supp. 3d 623, 633 (W.D.

Tex. 2023) ("[T]here is no legal or practical tradition of disarming persons based

on virtue.").

Rather than citing historical regulations, the government and the district

court simply quoted several pre-*Bruen* opinions that repeat the "virtuous citizens"

theory. Surface-level analysis of this type is incompatible with "the intensive

analysis on which the Supreme Court relied in *Bruen*." *United States v. Kelly*, 2022

WL 17336578, at *3 (M.D. Tenn. Nov. 16, 2022) (chiding the government for

offering only "citations to caselaw discussing history, not a comprehensive review

of the history itself").

In any event, the opinions cited by the government and district court are

39

unpersuasive. All of them ultimately trace the "virtuous citizens" theory back to the same handful of law-review articles. *See, e.g.*, *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011) (citing Don B. Kates, Jr., *The Second Amendment: A Dialogue,* Law & Comtemp. Probs., Winter 1986). But those law-review articles are "not supported by history." *Folajtar v. Att'y Gen.*, 980 F.3d 897, 915 (3d Cir. 2020) (Bibas, J., dissenting). "Not one" of them cites any "primary sources (apart from the ratifying conventions)" that suggest unvirtuousness could justify disarmament. *Id.* at 918.

That evidentiary void is unsurprising. "[V]irtue exclusions are associated with civic rights" such as the right to vote or serve on a jury—i.e., "individual rights that require citizens to act in a collective manner for distinctly public purposes." *Kanter*, 919 F.3d at 462 (Barrett, J., dissenting). *Heller*, however, "expressly reject[ed] the argument that the Second Amendment protects a purely civic right," holding instead that the right to keep and bear arms is an "individual right." *Id.* at 463; *see also Folajtar*, 980 F.3d at 916-18 (Bibas, J., dissenting) (noting "virtue" theory rests on the view that Second Amendment protects a "civic," "collective" right—an idea that "conflicts with" and was "rejected by" *Heller*). "[T]he Government has presented no evidence that virtue exclusions ever applied to *individual* rights, which (now) undeniably include the Second Amendment's

40

guarantee of the right to keep and bear arms." *United States v. Leblanc*, 2023 WL 8756694, at *9 (M.D. La. Dec. 19, 2023) (emphasis in original). Accordingly, the virtuous-citizens theory has no role to play in Second Amendment litigation.

### iii. The government did not show Jackson is "dangerous."

Even if the sources above added up to a tradition of disarming "dangerous" groups, they would not justify disarming Jackson, as the government failed to show—or even try to show—that his Arizona indictment indicated dangerousness. Nothing about Jackson's misconduct-involving-weapons charge (the offense identified in his federal indictment) suggests he is "dangerous."

Under Arizona law, a person commits misconduct involving weapons by knowingly "[m]anufacturing, possessing, transporting, selling or transferring a prohibited weapon." Ariz. Rev. Stat. Ann. § 13-3102(A)(3). A "prohibited weapon" is defined to include "[a] rifle with a barrel length of less than sixteen inches." *Id.* § 13-3101(A)(8). The indictment tracks this statutory language, alleging Jackson "knowingly did manufacture, possess, transport, sell, or transfer a 10 5 inch barrel rifle, a prohibited weapon." J.A.63.

The mere possession of a firearm, standing alone, does not indicate that the possessor is dangerous. And even if it did, the facts of Jackson's case indicate that *his* possession, in particular, did not suggest dangerousness. The rifle in question

41

belonged not to Jackson, but to Wesley Temple, who pled guilty to possessing that weapon. *See* J.A.57-58, J.A.173. Jackson's only connection to the firearm was that it was found in the trunk of a car he was driving with Temple. J.A.173.

As multiple Arizona state judges recognized, these facts do not suggest Jackson is dangerous. Except in narrow circumstances not relevant here, felony indictees in Arizona are entitled to pretrial release as a matter of right. *See* Ariz. R. Crim. P. 4.2(a)(6)-(8). Before releasing the defendant, however, a judge must impose certain mandatory conditions, *see* Ariz. R. Crim. P. 7.3(a), as well as any "additional conditions [that] are reasonably necessary to … protect the victim, any other person, or the community from risk of harm by the defendant," Ariz. R. Crim. P. 7.2(a)(2). Arizona law specifically authorizes judges, in fashioning discretionary release conditions, to "prohibit[] the defendant from possessing any dangerous weapon." Ariz. R. Crim. P. 7.3(d)(1)(C). When making her release decision, a judge must consider factors such as (1) "[t]he nature and circumstances of the offense charged" and (2) "[e]vidence that the accused poses a danger to others in the community." Ariz. Rev. Stat. Ann. § 13-3967(B)(2), (4) (cross-referenced in Ariz. R. Crim. P. 7.2(a)(3)).

Two separate judges conducted this individualized release analysis in Jackson's case (following the complaint and then again following indictment).

42

J.A.61, J.A.75. And both those judges—who were familiar with the specific facts of Jackson's case—determined he could be released subject only to the mandatory conditions in Rule 7.3(a). J.A.60, J.A.75-76. Importantly, those mandatory conditions do *not* prohibit a defendant from possessing a firearm (or any other weapon). Neither Arizona judge, in other words, found any evidence that Jackson "pose[d] a danger to others in the community," § 13-3967(B)(4), or believed it necessary to "prohibit[] [Jackson] from possessing any dangerous weapon," such as a firearm, Ariz. R. Crim. P. 7.3(d)(1)(C). Whatever the government's ill-defined "dangerous" standard means, the Arizona courts' decision to release Jackson without a no-firearms condition provides strong evidence that he is not dangerous. *Cf. United States v. Van Dyke*, 2024 WL 1514129, at *6 (D. Idaho Apr. 8, 2024) ("The record in this case does not indicate that the state court found Van Dyke to be unusually dangerous. And, absent such a finding, the government's historical evidence related to the disarming of dangerous people cannot save this prosecution.").

Even the Arizona prosecutors appear to agree. In May 2022, several months after Jackson's arrest in Maryland, prosecutors in Phoenix dismissed all charges against him. J.A.68. Although state prosecutors later obtained another indictment for hindering prosecution and passively resisting arrest, Jackson was not re-indicted

for misconduct involving weapons. J.A.371-372. It is impossible to know with certainty why Jackson was not charged with the weapons offense again, but most likely it's because (1) prosecutors determined Jackson's conduct was not serious enough to be worth prosecuting, or (2) the grand jury determined Jackson did not commit that offense. Neither explanation gives any reason to believe Jackson was dangerous.

The government and district court apparently believed that the mere fact of an indictment, without more, establishes dangerousness. But that is simply not true. Grand juries are not asked to make dangerousness findings. An "indictment by a grand jury need only show probable cause that an individual *committed a crime*"—not probable cause that he is dangerous. *Stambaugh*, 641 F. Supp. 3d at 1192 (emphasis added). Unless every felony is indicative of dangerousness—which no one believes—an indictment does not establish that the indictee is dangerous. *See Van Dyke*, 2024 WL 1514129, at *8 n.7 ("Of course, the mere fact that Van Dyke was charged with a crime does not amount to an implicit finding of dangerousness.").

Indeed, the criminal system in Arizona, as in other states, assumes that a finding of dangerousness must be made separately from a grand jury's finding of probable cause. That dangerousness finding is made *after* indictment, when "a

44

neutral magistrate" determines whether the defendant would "pose a threat to society" if released pending trial. *Stambaugh*, 641 F. Supp. 3d at 1192. If a grand jury's probable-cause finding represented an implicit finding of dangerousness, judicial detention hearings would be unnecessary. *See Laurent*, 861 F. Supp. 2d at 80 ("While the grand jury which originally indicted [the defendant] determined that there was probable cause of a crime, there has not necessarily been an independent judicial determination that the defendant poses a danger to the community.").

Nor could the district court adopt the "indictment means dangerous" shorthand simply because it thought that's what Congress did in § 922(n). *See* J.A.293 (concluding legislatures have "broad discretion" to decide which groups are "sufficient[ly]" dangerous "to warrant disarmament"). As explained above, "reflexive[] defer[rence]" to such "predictive judgments" is exactly what *Bruen* sought to root out. *Ass'n of N.J. Rifle & Pistol Clubs*, 910 F.3d at 130-31 (Bibas, J., dissenting); *see Bruen*, 597 U.S. at 26 (explaining "deference to legislative interest balancing" is not "appropriate" in Second Amendment context). That kind of uncritical deference threatens to render the Second Amendment a dead letter. "A legislature's ability to deem a category of people dangerous based only on belief would subjugate the right to bear arms 'in public for self-defense' to 'a second-

class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Worth*, 2024 WL 3419668, at *11 (quoting *Bruen*, 597 U.S. at 70).

If the government wishes to disarm someone based on "dangerousness," it must bring forward evidence that he is, in fact, dangerous. *See id.* at *10 (striking down state statute because "Minnesota claims that 18 to 20-year-olds present a danger to the public, but it has failed to support its claim with enough evidence"). The government failed to do so in Jackson's case.

### b.    Pretrial detention

The district court also cited "the historical tradition of sometimes detaining defendants charged with serious crimes." J.A.291. According to the court, the greater includes the lesser: if the government has power to detain a felony indictee and thereby deprive him of firearms entirely, then it necessarily also has power to release him while restricting his right to ship or transport firearms, as § 922(n) does. J.A.286-287, J.A.292.

Perhaps this argument would have some force in a facial challenge, where the government need only show that § 922(n) "is constitutional in *some* of its applications." *Rahimi*, 144 S. Ct. at 1898 (emphasis added). If felony indictees could be detained, and thereby disarmed, in 1791, then the Second Amendment likely allows present-day disarmament of felony indictees who are detained.

46

But Jackson was *not* detained in his Arizona case, so for purposes of his as-applied challenge, he is not similarly situated to detained indictees at the Founding. The fact that Founding-era legislatures took firearms away from *detained* indictees—because of "the obvious security concerns that would attend prisoners having guns"—tells us nothing about whether those legislatures would have believed *released* indictees could be disarmed as well. *United States v. Rogers*, 2024 WL 692701, at *8 (N.D. Ohio Feb. 20, 2024).

The court made this point in *Rogers*, where the government offered the Judiciary Act of 1789—which permitted pretrial detention of people charged with capital crimes—as an analogue to § 922(n). *See* Matthew J. Hegreness, *America's Fundamental and Vanishing Right to Bail*, 55 Ariz. L. Rev. 909, 949 (2013). Comparing the Judiciary Act to § 922(n), *Rogers* noted that "[t]he type of conduct that corresponds to each law is diametrically opposite: either a person is detained, and therefore prevented from receiving a gun due to jail security protocols, or the person is not detained, and the only thing keeping that person from possessing a gun pretrial is § 922(n)." 2024 WL 692701, at *8. For all practical purposes, the two statutes apply to entirely different populations, and therefore they are not "relevantly similar." *Id.* Accordingly, pretrial-detention practices at the Founding

do nothing to show that § 922(n) is constitutional *as applied to Jackson*.[5]

Regardless, § 922(n) is dissimilar to pretrial detention in terms of "why" and "how" it burdens Second Amendment rights. *Bruen*, 597 U.S. at 29.

---

[5] The district court reasoned, similarly, that "[t]he government has always been able to impose 'substantial liberty restrictions' on indicted defendants … when needed to promote 'the operation of our criminal justice system.'" J.A.286 (quoting *United States v. Salerno*, 481 U.S. 739, 749 (1987)). And those restrictions—e.g., detention, limitations on speech and association, and reduced privacy expectations—impinge on freedoms protected by other parts of the Bill of Rights, such as the First, Fourth, and Fifth Amendments. Therefore, the court concluded, the government must also be able to impose restrictions on indictees' Second Amendment rights if doing so promotes the needs of the criminal justice system. *See* J.A.286, J.A.291-292.

"That argument is unconvincing." *Rowson*, 652 F. Supp. 3d at 456. Jackson "has not brought a due process challenge" under the Fifth Amendment, *id.*, nor a free-speech or privacy challenge under the First or Fourth Amendments. The fact that *those* rights can be restricted by pretrial detention sheds no light on "this Nation's historical tradition of *firearm* regulation." *Bruen*, 597 U.S. at 34 (emphasis added); *see Bartucci*, 658 F. Supp. 3d at 799 (like *Rowson*, rejecting government's request to apply *Salerno* analysis, because "Defendant has not raised a due process challenge to Section 922(n)"); *Rogers*, 2024 WL 692701, at *7 (other "liberty restrictions" on detainees "do[] not speak to public attitudes or understandings of the scope of a person's *right to keep and bear arms*" (emphasis added)).

Additionally, *Salerno*—as well as cases restricting pretrial detainees' First and Fourth Amendment rights—employ means-ends balancing. *Salerno*, 481 U.S. at 748-51 (Fifth Amendment); *see also, e.g.*, *United States v. Scott*, 450 F.3d 863, 873 (9th Cir. 2006) (Fourth Amendment); *United States v. Spilotro*, 786 F.2d 808, 816 (8th Cir. 1986) (First Amendment). But since *Bruen* "pointedly rejected, for Second Amendment challenges, the means-end balancing framework," it makes no sense to import the *Salerno* methodology into this context. *Rowson*, 652 F. Supp. 3d at 456; *see also United States v. Posada*, 670 F. Supp. 3d 402, 405 n.2 (W.D. Tex. 2023) ("*Salerno*'s framework employs means-ends balancing, which the Supreme Court in *Bruen* clearly rejected for Second Amendment challenges. And nothing in *Bruen* suggests that courts should forego analysis under the Second Amendment in favor of another constitutional provision that also has some bearing on the proscribed conduct.").

### i.    The "why"

At the founding, pretrial detention was intended solely to ensure the defendant's appearance at trial—not to protect the community. *See, e.g.*, Shima Baradaran, *Restoring the Presumption of Innocence*, 72 Ohio St. L.J. 723, 732-33 (2011) ("Bail historically served the sole purpose of returning the defendant to court for trial, not preventing her from committing additional crimes. … Bail was not denied based on justifications of public safety or dangerousness posed by these defendants, and was solely denied when the court was not assured that defendant would appear at trial."); Lauryn P. Gouldin, *Disentangling Flight Risk from Dangerousness*, 2016 B.Y.U. L. Rev. 837, 845 n.24 (2016) ("[A]ll the available evidence points to the fact that pretrial detention, both under the English common law and at the time the Constitution was written, was limited to flight risk."); William F. Duker, *The Right to Bail: A Historical Inquiry*, 42 Alb. L. Rev. 33, 68-69 (1977) (stating, of early-republic practice, that "[t]he function of bail [wa]s thus limited to insuring the presence of a defendant before the court" and was not intended "to prevent the commission of crimes"); Evan Shapiro, *Section 3142(e) of the 1984 Bail Reform Act: Rebuttable Presumption or Mandatory Detention?*, 35 Buff. L. Rev. 693, 695 (1986) (similar).

The purpose of Founding-era pretrial detention is reflected in its widespread

availability. At the Founding, colonies, states, and the federal government developed a near-universal "consensus," reflected in constitutions and statutory law: "the right to bail was automatic and inalienable for all crimes not punishable by death." Hegreness, 55 Ariz. L. Rev. at 912-15; *see also id.* at 922-23. Even in capital cases, defendants were "entitled" to bail "unless the evidence of their guilt was great." *Id.* at 912. Colonial court records therefore "show frequent instances of capital defendants, even those arrested for murder or treason, being released on bail before trial." Donald B. Verrilli, Jr., *The Eighth Amendment and the Right to Bail: Historical Perspectives*, 82 Colum. L. Rev. 328, 349 (1982).[6]

The federal Judiciary Act of 1789 is illustrative. That statute, passed two years before ratification of the Second Amendment, provided that "upon all arrests in criminal cases, bail shall be admitted, except where the punishment may be death," in which case a judge could, in his "discretion," release the defendant. Judiciary Act of 1789, ch. 20, § 33, 1 Stat. 73, 91. Importantly, numerous federal crimes that might suggest the offender posed a threat to others—e.g., manslaughter, malicious maiming, confederacy to become a pirate—were non-

---

[6] Capital offenses were not automatically bailable because, in Blackstone's words, "In … offences of a capital nature, no bail can be a security equivalent to the actual custody of the person. For what is there that a man may not be induced to forfeit, to save his own life?" 4 William Blackstone, Commentaries *294.

capital in 1790, and therefore automatically bailable. Royce de R. Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous"*, 25 Tex. Rev. L. & Pol. 245, 280 (2021) (citing federal statutes). The same was true in the states, where "many" seemingly dangerous crimes, "such as arson, burglary, and robbery, were absent from the colonists' list of capital crimes." Verrilli, 82 Colum. L. Rev. at 349. Classifying those offenses as non-capital—and therefore automatically bailable—demonstrates that pretrial detention was aimed at preventing flight, not protecting the community.

By contrast, § 922(n) is not intended to ensure a defendant's appearance at trial, but to prevent interpersonal violence. Because its "why" is wholly different, § 922(n) and Founding-era detention practices are not "comparably justified." *Bruen*, 597 U.S. 29.

### ii.    The "how"

Even assuming the Founding generation used pretrial detention to address community safety, it did so in a way that imposed a materially lighter "burden on the right of armed self-defense" than § 922(n). *Id.*

As the Judiciary Act makes clear, any decision to detain a defendant pending trial was "discretion[ary]," i.e., based on "the nature and circumstances of the offence, and of the evidence, and the usages of law." 1 Stat. 73, 91. In other words,

51

an indictee could be detained—and thereby disarmed—only if a neutral magistrate first made an individualized, evidence-based determination that the indictee's release would threaten other people's safety.

Section 922(n) is different. It is a blanket prohibition that applies to all indictees, regardless of whether a judge has determined they threaten community safety. As relevant to this as-applied challenge, the statute applies to Jackson notwithstanding that two separate Arizona judges concluded, after appraising the facts of Jackson's individual case, that his release would pose no danger to the community, *even if he was allowed to possess firearms*. A statute disarming someone whose individualized risk assessment shows he is *not* dangerous imposes a much greater burden on the arms right than a regulation disarming *only* people whose individualized risk assessments show they *are* dangerous.

The Supreme Court recognized the importance of this distinction in *Rahimi*, where it held America's "tradition of firearm regulation distinguishes citizens who have been found to pose a credible threat to the physical safety of others from those who have not." 144 S. Ct. at 1902. On that basis, the Court upheld § 922(g)(8)(C)(i) because the statute, like the government's proffered analogues, requires "*judicial determinations* of whether *a particular defendant* likely would threaten or had threatened another with a weapon." *Id.* (emphasis added); *see also,*

*e.g.*, *id.* at 1903 ("[W]e conclude only this: An individual *found by a court* to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." (emphasis added)). Pretrial detention, unlike § 922(n), entails "judicial determinations of whether a particular defendant likely would threaten or had threatened another [person]." Accordingly, § 922(n) is not "analogous enough to pass constitutional muster." *Id.* at 1898.

It does not matter that a grand jury, before returning an indictment, makes an individualized assessment of the defendant. A grand-jury proceeding (the triggering event for § 922(n) liability) and a detention hearing (the triggering event for pretrial detention) are designed to answer different questions. A grand jury "need only [find] probable cause that an individual *committed a crime*"; it is not asked to make—and does not make—an "individualized finding" that a defendant threatens others' safety. *Stambaugh*, 641 F. Supp. 3d at 1192 (emphasis added); *see also Reaves*, ECF 55 at 21 ("Section 922(n) includes no individualized assessment or considerations [of dangerousness]."). An indictment, therefore, does not require the kind of individualized determination that matters for Second Amendment purposes: that "a particular defendant *likely would threaten or had threatened another [person].*" *Rahimi*, 144 S. Ct. at 1902.

And even if an indictment does somehow measure a defendant's threat to

others, it does so in a way that imposes a greater burden on the arms right than

pretrial detention. Jackson has not found any sources that discuss the substance of

Founding-era detention hearings, but if they were anything like today's, they

provided "substantial[ly]" more "procedural safeguards" than an indictment.[7]

*Quiroz*, 629 F. Supp. 3d at 525. As explained above, grand-jury proceedings are not

"adversarial." *Hicks*, 649 F. Supp. 3d at 365. A defendant receives neither notice of

an indictment nor an opportunity to be heard before the grand jury. *Stambaugh*, 641

F. Supp. 3d at 1192. The rules of evidence do not apply; prosecutors need not

present exculpatory evidence; and grand jurors may hear evidence obtained in

violation of the Fourth and Fifth Amendments. *Quiroz*, 629 F. Supp. 3d at 524;

*Laurent*, 861 F. Supp. 2d at 88.

A detention hearing provides much more robust procedural protections. The

federal Bail Reform Act, for instance, gives indictees the right "to testify, to

present witnesses, to cross-examine witnesses who appear at the hearing, and to

present information by proffer or otherwise." 18 U.S.C. § 3142(f). Indictees also

have the right to counsel, including the right "to have counsel appointed" if they

are indigent. *Id.* And the magistrate judge must support her detention findings by

---

[7] Of course, the "burden" is on the government to show that Founding-era pretrial detention is sufficiently analogous to § 922(n). *Bruen*, 597 U.S. at 33-34.

54

"clear and convincing evidence." *Id.* If an indictee believes the magistrate judge

has erred, he can seek "immediate appellate review of the detention decision."

*Salerno*, 481 U.S. at 752 (citing 18 U.S.C. § 3145(c)). These procedures—which are

"specifically designed to further the accuracy of [a future-dangerousness]

determination," *id.* at 751—are absent from the grand jury. Because § 922(n)

disarms indictees without ensuring they actually threaten others' safety, it imposes

a greater "burden on the right of armed self-defense" than pretrial detention.

*Bruen*, 597 U.S. at 29; *see Stambaugh*, 641 F. Supp. 3d at 1193 (holding pretrial

detention not analogous to § 922(n) because the former gave defendants "an

opportunity to appear and argue for their release").

### c.    Surety statutes

Finally, the district court analogized § 922(n) to "the surety laws discussed

in *Bruen*." J.A.287. Those laws provided that if someone carried arms publicly in a

way that gave others "reasonable cause to fear an injury, or breach of the peace,"

he would have to cease carrying unless he posted a "surety of the peace," i.e., a

money bond. *Bruen*, 597 U.S. at 56. Under the terms of the surety, the money

"would be forfeited if [the accused] breached the peace or injured others—a

requirement from which he was exempt if *he* needed self-defense." *Id.* at 56-57

(emphasis in original). In short, surety laws "required any person who was

55

reasonably likely to breach the peace, and who, standing accused, could not prove a special need for self-defense, to post a bond before publicly carrying a firearm." *Id.* at 56.

These laws are not "analogous enough" to support applying § 922(n) to Jackson. *Id.* at 30.

***First,*** surety statutes required "judicial determinations of whether *a particular defendant* likely would threaten or had threatened another with a weapon." *Rahimi*, 144 S. Ct. at 1902 (emphasis added). Those statutes "presume[d]" that "the Second Amendment right may *only* be burdened once a defendant has been found to pose a credible threat to the physical safety of others." *Id.* (emphasis added). In other words, disarmament was impermissible unless "a neutral magistrate" made "a specific, individualized finding" that the accused was likely to cause injury or breach the peace. *Stambaugh*, 641 F. Supp. 3d at 1192. But § 922(n) "requires no such individualized finding." *Id.* As explained above, grand juries do not—and are not asked to—decide whether "a particular defendant," *Rahimi*, 144 S. Ct. at 1902, is likely to harm others or breach the peace. Instead, "an indictment by a grand jury need only show probable cause that an individual committed a crime, and the crime need not even relate to a firearm." *Stambaugh*, 641 F. Supp. 3d at 1192; *see also Reaves*, ECF 55 at 21 (whereas surety laws

"required a showing of an individualized need for the restriction," "[s]ection 922(n) includes no individualized assessment or considerations").

The unindividualized nature of § 922(n) fatally undermines the statute's constitutionality, as "individualized risk assessments were central to the Anglo-American tradition of disarming dangerous people." *Van Dyke*, 2024 WL 1514129, at *8; *see also id.* ("[B]efore the Second Amendment right could be burdened [under a surety law], the person seeking the bond had to make a 'specific showing' of risk." (quoting *Bruen*, 597 U.S. at 56)). Accordingly, "the surety laws do not impose a comparable burden on the right of armed self-defense to the burden imposed by § 922(n)." *Reaves*, ECF 55 at 21.

***Second*,** surety laws "often offered the accused significant procedural protections":

> Before the accused could be compelled to post a bond for "going armed," a complaint had to be made to a judge or justice of the peace by "any person having reasonable cause to fear" that the accused would do him harm or breach the peace. The magistrate would take evidence, and—if he determined that cause existed for the charge—summon the accused, who could respond to the allegations.

*Rahimi*, 144 S. Ct. at 1900 (citations omitted).

An indictment provides none of these protections. A grand jury "is not an adversarial proceeding," *Hicks*, 649 F. Supp. 3d at 365, and defendants "are entitled to neither notice of, nor an opportunity to be heard at, grand jury

proceedings," *Stambaugh*, 641 F. Supp. 3d at 1192. Unlike someone accused under a surety statute, a felony indictee "never has a chance to contest their Second Amendment-rights-depriving status." *Stambaugh*, 641 F. Supp. 3d at 1192. To the contrary, a "grand jury gets to say—without any review, oversight, or second-guessing—whether probable cause exists to think that a person committed a crime." *Kaley v. United States*, 571 U.S. 320, 328 (2014). The result is that surety statutes did not impose a comparable burden as § 922(n), which disarms even people, like Jackson, whom adversarial detention hearings have revealed to be *not* dangerous.

*Third,* under surety statutes, "an individual could obtain an exception if he needed his arms for self-defense or some other legitimate reason." *Rahimi*, 144 S. Ct. at 1900. Section 922(n), however, contains no exception for self-defense, which "is the *central component* of the Second Amendment right." *Bruen*, 597 U.S. at 32 (emphasis in original). Because "[s]urety laws and § 922(n) … impose qualitatively different burdens on the 'central component' of the Second Amendment right," the former are not a proper analogue for the latter. *Stambaugh*, 641 F. Supp. 3d at 1192; *see also Quiroz*, 629 F. Supp. 3d at 521 (same); *Hicks*, 649 F. Supp. 3d at 365 (same); *United States v. Holden*, 638 F. Supp. 3d 931, 937-38 (N.D. Ind. 2022) (same), *rev'd on other grounds*, *United States v. Holden*, 70 F.4th 1015 (7th Cir.

2023).

Despite these differences, the district court appeared to conclude § 922(n) imposes a lesser burden on the arms right than surety laws because § 922(n)'s restriction is "temporary," lasting "only from indictment to conviction or acquittal." J.A.288. But surety bonds were temporary, too. They "could not be required for more than six months at a time," *Rahimi*, 144 S. Ct. at 1900—a period much shorter than many indictments, which can pend for several years or longer before a criminal case is resolved. As relevant to Jackson's as-applied challenge, he had been under indictment for over a year by the time he transported his firearm to Maryland, and his Arizona case was still unresolved at the time of sentencing in his federal case—more than three years after the state indictment was returned. Section 922(n)'s "temporary" nature therefore does not render the statute constitutional as applied to Jackson.

## Conclusion

Section 922(n) violates the Second Amendment as applied to Jackson. The Court should reverse the denial of Jackson's dismissal motion and remand with instructions to vacate his conviction and dismiss the indictment.

James Wyda
Federal Public Defender

Cullen Macbeth
Assistant Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 344-0600

/s/ Cullen Macbeth
Cullen Macbeth

**Statement Regarding Oral Argument**

This appeal raises a novel and important issue about the scope of the government's power to deny firearms to American citizens who have not been convicted of any crime, and whose conduct indicates they are not dangerous. It appears this Court has never addressed whether 18 U.S.C. § 922(n) violates the Second Amendment, either before or after *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Jackson believes oral argument would assist the Court in resolving this unsettled issue.

## Certificate of Compliance

1. This brief has been prepared in Microsoft Word using 14-point, proportionally spaced, serif typeface.

2. Excluding the items identified in Federal Rule of Appellate Procedure 32(f), this brief contains 12,949 words.

/s/ Cullen Macbeth
Cullen Macbeth
Assistant Federal Public Defender

**Certificate of Service**

I certify that on July 31, 2024, I electronically filed the foregoing brief with the Clerk of Court using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

<u>/s/ Cullen Macbeth</u>
Cullen Macbeth
Assistant Federal Public Defender