No. 24-4114

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

BRANDON GLEN JACKSON,

Defendant - Appellant.

*Appeal from the United States District Court for the
District of Maryland, Northern Division
The Honorable Ellen L. Hollander, United States District Judge*

RESPONSE BRIEF OF APPELLEE
UNITED STATES OF AMERICA

> Erek L. Barron
> United States Attorney
>
> David C. Bornstein
> Assistant United States Attorney
> Chief, Appellate Division
>
> Jason D. Medinger
> Assistant United States Attorney
> 36 S. Charles Street, Fourth Floor
> Baltimore, Maryland 21201
> (410) 209-4800

November 25, 2024          *Attorneys for the Appellee*

# **TABLE OF CONTENTS**

INTRODUCTION AND STATEMENT OF JURISDICTION .................................1

STATEMENT OF THE ISSUE..................................................................2

STATEMENT OF THE CASE..................................................................2

SUMMARY OF ARGUMENT .................................................................5

ARGUMENT .....................................................................................7

THE DISTRICT COURT PROPERLY CONCLUDED THAT 18 U.S.C. § 922(N) IS CONSTITUTIONAL UNDER THE SECOND AMENDMENT AS APPLIED TO JACKSON .......................................................................................7

    A.    Standard of Review And Applicable Legal Principles........................8

    B.    Jackson's Conduct Of Transporting A Firearm While Under Indictment Falls Outside Of What The Plain Text Of The Second Amendment Protects ................................................................10

    C.    Jackson's Conviction For Transporting A Firearm While Under Indictment Is Consistent With The Historical Tradition Of This Country To Disarm Certain Individuals Facing Prosecution ............17

CONCLUSION...................................................................................44

STATEMENT WITH RESPECT TO ORAL ARGUMENT ................................45

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

## CASES

*Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023)................................................14

*Barrett v. United States*, 423 U.S. 212 (1976)...........................................................19

*Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) (en banc) ...................................40

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...............................................11

*Furman v. Georgia*, 408 U.S. 238 (1972)...................................................................23

*Huddleston v. United States*, 415 U.S. 814 (1974) ...................................................19

*Lewis v. United States*, 445 U.S. 55 (1980) ...............................................................20

*Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211 (4th Cir. 2024) (en banc) . 8, 28

*Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2018) ...............................................23

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 571 U.S. 1 (2022) .......... passim

*Patterson v. Winn*, 5 Pet. 233 (1831).........................................................................28

*Range v. Attorney General*, 53 F.4th 262 (3rd Cir. 2022) ......................................28

*Teixeira v. Cnty. of Alameda*, 873 F.3d 670 (9th Cir. 2017) (en banc) ........... 13, 14

*Tennessee v. Garner*, 471 U.S. 1 (1985)............................................................. 13, 21

*United States v. Adams*, 914 F.3d 602 (8th Cir. 2019) ............................................17

*United States v. Baker*, 2024 WL 24088 (W.D. Okla. Jan. 2, 2024).......................28

*United States v. Bena*, 664 F.3d 1180 (8th Cir. 2011)..............................................30

*United States v. Canada*, 103 F.4th 257 (4th Cir. 2024) .........................................24

ii

*United States v. Claybrooks,* 90 F.4th 248 (4th Cir. 2024) ........................................8

*United States v. Gore*, 118 F.4th 808 (6th Cir. 2024)................................... 7, 13, 20

*United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023) ............................................26

*United States v. Libertad*, 681 F.Supp.3d 102 (S.D.N.Y. 2023) ............................14

*United States v. Perez-Garcia*, 96 F.4th 1166 (9th Cir. 2024) ......................... 13, 21

*United States v. Price*, 111 F.4th 392 (4th Cir. 2024) ...................................... 11, 16

*United States v. Quiroz*, 629 F.Supp.3d 511 (W.D. Tex. 2022) ...................... 19, 34

*United States v. Rahimi*, 602 U.S. __, 144 S. Ct. 1889 (2024)....................... passim

*United States v. Rowson*, 652 F. Supp. 3d 4360 (S.D.N.Y. 2023) ..........................35

*United States v. Salerno*, 481 U.S. 739 (1987) ........................................................36

*United States v. Slye*, 2022 WL 9728732 (W.D. Pa. Oct. 6, 2022) ........................22

*United States v. Smith*, 2024 WL 328871 (D. Mass. Jan. 29, 2024) ......................16

*United States v. Walker*, 2024 WL 4024204 (D. Minn. Sept. 3, 2024)...................21

*United States v. Yancey*, 2024 WL 317636 (8th Cir. Jan. 29, 2024) ......................21

*Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021) (en banc) ......................................32

## FEDERAL AND STATE STATUTES AND RULES

U.S. CONST., amend. II .............................................................................................22

18 U.S.C. § 922(g)(1)................................................................................................24

18 U.S.C. § 922(g)(8)..................................................................................................9

18 U.S.C. § 922(k) ....................................................................................................11

18 U.S.C. § 922(n) ............................................................................................ passim

iii

18 U.S.C. § 3231 ..............................................................................2

28 U.S.C. § 1291 ..............................................................................2

Fed. R. Crim. P. 11(a)(2) ................................................................5


Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662) ............................25

Sir John Knight's Case, 87 Eng. Rep. 75, 76 (K.B. 1686) ......................26

1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 52–53 (1869) ...................................................................................27

Acts and Laws of His Majesty's Province of New Hampshire in New England; with Sundry Acts of Parliament 17 (1771) ...............................................27

1 Laws of the State of North Carolina, including the Titles of Such Statutes and Parts of Statutes of Great Britain as Are in Force in Said State 131–32 (1821)......27

Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force 33 (1794) .................................27

The Judiciary Act of 1789, Act of Sept. 24, 1789, ch. XX, 1 Stat. 73, § 33 (1789)22

15 The Public Records of the Colony of Connecticut 191 (1890) .........................14

1825 N.H. Laws 74, An Act to Regulate the Keeping and Selling, and the Transporting of Gunpowder, ch. 61, § 5................................................15

A Compilation of the Statutes of Tennessee of a General and Permanent Nature, from the Commencement of the Government to the Present Time 99–100 (1836) 28

Colonial Laws of Massachusetts Reprinted from the Edition of 1672 (1890) ........14

# SECONDARY SOURCES

Thomas M. Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union (1869).........................29

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 WYO. L. REV. 249, 259-261 (2020)..........26

Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986).............................................................................................30

Sandra G. Mayson, *Dangerous Defendants*, 127 YALE L.J. 490, 502 (2018).. 22, 42

4 William Blackstone, Commentaries on the Laws of England 252 (1769)...........32

## INTRODUCTION AND STATEMENT OF JURISDICTION

In January 2021, Defendant-Appellant Brandon Glen Jackson was indicted in the State of Arizona for misconduct involving weapons, a felony offense, in connection with his participation in a protest at the state capitol.   JA 62; JA 303; JA 341-343.

Then, in February 2022, while he was still under indictment, Jackson traveled to Maryland to participate in another protest.   JA 303; JA 341-343.   He brought multiple firearms with him.   *Id.*; JA 67.

In March 2022, police responded to the scene of the Hagerstown, Maryland Speedway where the protesters were encamped.   JA 303; JA 341-343.   Police received a report that a man was obstructing the entrance to the speedway with his vehicle.   *Id.*   When he was later confronted by law enforcement, Jackson admitted he was carrying a concealed firearm without a permit.   *Id.*   He was arrested on state charges.   JA 67.   He was later charged federally with unlawful shipping and transportation of a firearm by a person under felony indictment, in violation of 18 U.S.C. § 922(n).   JA 22.

1

He pled guilty pursuant to a conditional plea, reserving the right to appeal the denial of his Second Amendment challenge to Section 922(n).   JA 295-299. Following sentencing, he filed a timely notice of appeal.   JA 402.

The district court (Hon. Ellen L. Hollander, J.) had jurisdiction over this federal criminal case under 18 U.S.C. § 3231.   This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.   As the district court properly found, Section 922(n) is constitutional as applied to Jackson.   This Court should affirm.

## STATEMENT OF THE ISSUE

Whether 18 U.S.C. § 922(n), as applied to Jackson, is constitutional under the Second Amendment consistent with *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 571 U.S. 1 (2022) and *United States v. Rahimi*, 602 U.S. __, 144 S. Ct. 1889 (2024).

## STATEMENT OF THE CASE

On December 4, 2020, Jackson was involved in an incident at a protest at the Arizona State Capitol in Phoenix, Arizona, that resulted in him being charged via complaint for several offenses.   JA 303; JA 341-43; JA 56-58.

Then, on January 28, 2021, an Arizona state grand jury returned an indictment in connection with the incident charging Jackson with: (1) hindering prosecution in

the first degree, a class 5 felony punishable by up to two years' incarceration; (2) misconduct involving weapons, a class 4 felony punishable by up to three years' incarceration; and (3) resisting arrest, a class 1 misdemeanor punishable by up to six months' incarceration.   JA 62-64.   On February 4, 2021, Jackson was released following arraignment on the indictment.   JA 76.

In February 2022, while he was still under indictment for felony firearm-related charges in Arizona, Jackson traveled to Maryland to participate in a truck convoy protest that was scheduled to take place on the D.C. Capital Beltway.   JA 303; JA 341-43.   While doing so, Jackson transported in his vehicle a Smith & Wesson 9mm handgun.   *Id.*

On March 24, 2022, while still under indictment for felony offenses in Arizona, Jackson was encountered by the Maryland State Police ("MSP").   *Id.* MSP had responded to the Hagerstown Speedway grounds, where the truck convoy was encamped, because of a report that a person was blocking the entrance to the Speedway with his vehicle.   *Id.*   When MSP arrived, they observed a man standing on top of a van yelling at bystanders and complaining about some of the protesters and the security that had been hired.   JA 66-67.   MSP later engaged with Jackson and tried to defuse the situation, asking Jackson to leave the Speedway encampment

3

for the night.  *Id.*  But Jackson refused, explaining that his belongings (including his guns) were back at the campsite inside the Speedway.  *Id.*  In this way, Jackson refused the officers' request because he did not want to be separated from his cache of firearms at the campsite.  *Id.*  At this, law enforcement asked if Jackson was presently armed.  *Id.*  Jackson admitted he was carrying a 9 mm handgun, without a permit.  JA 303; JA 341-343.  He was later arrested and charged with state offenses.  JA 65-67.

On April 14, 2022, a federal grand jury in the District of Maryland returned a one-count indictment charging Jackson with willfully shipping and transporting a firearm in interstate commerce while under indictment for a crime subject to incarceration for a term greater than one year, in violation of 18 U.S.C. § 922(n). JA 22.

On November 16, 2022, Jackson moved to dismiss the indictment, claiming that Section 922(n) violated the Second Amendment.  JA 25.  After extensive briefing (JA 25-150) and oral argument on the motion (JA 151-213), the district court denied Jackson's motion in a lengthy written opinion.  JA 260-294.  As to the first step of the *Bruen* analysis, the district court assumed *arguendo* that Jackson was covered by the plain text of the Second Amendment.  JA 276.  The court

4

nonetheless found that the statute was facially constitutional because it is consistent with this Nation's historical traditions of firearms regulation.    JA 291-293.    The court also found the statute was constitutional as applied to Jackson.    JA 293-294.

On October 3, 2023, Jackson pled guilty to the indictment, pursuant to Fed. R. Crim. P. 11(a)(2), reserving his right to appeal the denial of his motion to dismiss the indictment on Second Amendment grounds.    JA 299-305.    On February 2, 2024, the district court sentenced Jackson to time served, followed by three years of supervised release.    JA 396-397.    On February 5, 2024, Jackson filed a timely notice of appeal.    JA 402.

## SUMMARY OF ARGUMENT

Congress has prohibited individuals under indictment like Jackson from shipping, transporting, or receiving any firearm which has been shipped or transported in interstate or foreign commerce.    18 U.S.C. § 922(n).    This provision serves important public interests, including fostering public safety and maintaining the integrity of the criminal justice process.    Section 922(n) prevents an indictee, for example, from receiving a new gun which might be used to threaten victims, witnesses, prosecutors, or court personnel involved in his case.    Similarly, it prevents an indicted individual from shipping or transporting a firearm out of state,

5

which might allow him to dispose of it as evidence of his crime.   Further, it prevents an indicted individual from acquiring or transporting firearms that might be used to facilitate the indictee's flight across state lines or foreign boundaries to avoid prosecution.   But the burden imposed by Section 922(n) is only a slight one that applies to a narrow class of conduct.   And importantly, it does not impinge on the indictee's continued possession of firearms that were obtained pre-indictment for self-defense.

Here, the district court correctly concluded that Section 922(n) is constitutional under the Second Amendment both facially and as applied to Jackson. This is because Jackson's conduct placed him outside of what the plain text of the Second Amendment protects.   The statute does not impinge on the core conduct the Second Amendment was enshrined to protect, namely, *possession* of firearms for self-defense.   Here, by contrast, Jackson was indicted for *shipping* and *transporting* guns across state lines.   Because the plain text of the Second Amendment does not reach the conduct for which Jackson was prosecuted, Jackson's claim fails at step one of the *Bruen* analysis.

Additionally, Jackson's claim fails at step two of the *Bruen* analysis because Section 922(n) is fully consistent with this Nation's historical tradition of firearm

6

regulation. Founding Era regulations demonstrate a clear tradition of detaining and disarming felony indictees prior to trial. Additionally, Founding Era laws (such as the surety and "going armed" laws highlighted in *Rahimi*) provided for the disarmament of classes of people who were viewed as dangerous and not dependable adherents to the rule of law. In short, Founding Era principles and practices permitted the disarming of individuals like Jackson. As such, the Nation's historical tradition demonstrates that Congress was well within its rights to proscribe conduct like that committed by Jackson here.

For these reasons, Section 922(n) is perfectly constitutional under the Second Amendment, is consistent with the standards set forth in *Bruen* and *Rahimi*, and was properly applied as to the misconduct of Jackson. *See United States v. Gore*, 118 F.4th 808 (6th Cir. 2024) (affirming facial validity of Section 922(n)). This Court should affirm.

## ARGUMENT

## I. THE DISTRICT COURT PROPERLY CONCLUDED THAT 18 U.S.C. § 922(N) IS CONSTITUTIONAL UNDER THE SECOND AMENDMENT AS APPLIED TO JACKSON

The district court properly concluded that Section 922(n) is constitutional

as applied to Jackson.  To demonstrate why, the government first sets forth the standard of review and the legal test applicable to such Second Amendment challenges.  The government next demonstrates how Jackson's conduct falls outside of the plain text of the Second Amendment.  Finally, the government catalogs how Section 922(n) comports with this Nation's historical tradition of disarming individuals like Jackson prior to trial on a felony indictment.

### A.    Standard of Review and Applicable Legal Principles

This Court reviews preserved challenges to the constitutionality of a criminal statute *de novo.*  *United States v. Claybrooks,* 90 F.4th 248, 255 (4th Cir. 2024).

In *Bruen*, the Supreme Court established a two-part test for analyzing whether a firearm regulation is constitutional under the Second Amendment.  597 U.S. at 24.  First, the court must determine whether "the Second Amendment's plain text covers an individual's conduct."  *Id.* at 17.  If it does not, the analysis ends, and the government's regulation is valid.  The party challenging the regulation bears the burden on this step of the analysis to demonstrate that her conduct falls within the plain text of the Second Amendment.  *See Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 229 (4th Cir. 2024) (en banc).

8

At the second step of the analysis, the burden shifts to the government to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. In conducting this historical analysis, the Court recognized that the government need not present a one-to-one comparison between regulations in existence in 1791 and those at issue in the present litigation. *Id.* at 30. Rather, the government may demonstrate historical acceptance of a regulation by "analogy" to a "relevantly similar" regulation that existed in the Founding Era. *Id.* In doing so, the government only has to provide evidence of a "representative historical *analogue*, not a historical *twin*." *Id.* at 29-30 (emphasis in original).

In *Rahimi*, the Court applied these standards and upheld 18 U.S.C. § 922(g)(8), the prohibition on firearm possession by individuals who are subject to a domestic violence restraining order. The Court started its analysis by noting that "[w]hy and how the regulation burdens the right are central" to the *Bruen* test. 144 S. Ct. at 1898. After analyzing the purpose and methods of 922(g)(8), the Court explained that the statute's prohibitions were supported by historical surety laws, which authorized magistrates to "require individuals suspected of future misbehavior to post a bond," and historical "going armed" laws, which "provided a

9

mechanism for punishing those who had menaced others with firearms." *Rahimi*, 144 S. Ct. at 1900-1901. "Taken together," the Court said, "the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at 1901. The Court held that although Section 922(g)(8) "is by no means identical to these founding era regimes," it nevertheless "fits neatly within the tradition the surety and going armed laws represent." *Id.* Because the provision was "constitutional as applied to the facts of Rahimi's own case," the Court rejected Rahimi's facial challenge. *Id.* at 1898.

Against these standards, we may now analyze Section 922(n). As detailed below, Jackson's claim fails at both steps of the *Bruen* test.

### B. Jackson's Conduct Of Transporting A Firearm While Under Indictment Falls Outside Of What The Plain Text Of The Second Amendment Protects

Jackson was prosecuted for shipping and transporting a gun across state lines while he was under a felony indictment. Because Jackson's conduct puts him outside of what the plain text of the Second Amendment protects, his challenge fails at step one of the *Bruen* analysis.

10

The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST., amend. II. But that right is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008).

In determining whether an individual's conduct falls under the plain text of the Second Amendment, "[t]he *Bruen* Court asked three questions to resolve this inquiry: (1) whether the petitioners were 'part of the people whom the Second Amendment protects'; (2) whether the weapons regulated by the challenged regulation were 'in common use' for a lawful purpose, in that case, 'self-defense'; and (3) whether the Second Amendment protected the petitioners' 'proposed course of conduct.'" *United States v. Price*, 111 F.4th 392, 400 (4th Cir. 2024) (en banc) (quoting *Bruen*, 597 U.S. at 31-32) (holding that the federal prohibition on possession of firearms with obliterated serial numbers in 18 U.S.C. § 922(k) did not fall within the plain text of the Second Amendment).

Here, Jackson's claim fails at step one of the *Bruen* analysis because he has not carried his burden to demonstrate that his conduct is covered by the plain text of the Second Amendment, particularly as that text was understood during the Founding Era. As the Supreme Court made clear, at the time of the Founding, to

11

"keep" meant to "'[t]o retain; not to lose,' and '[t]o have in custody' and to 'have.'" *Heller*, 554 U.S. at 582 (citations omitted). Further, to "bear" a firearm meant to "wear, bear, or carry [it] . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person." *Bruen*, 597 U.S. at 22. The conduct for which Jackson was convicted under Section 922(n) ("shipping" and "transporting" a firearm across state lines) meets neither of these definitions.

Obviously, "shipping" a firearm has nothing to do with "keeping" and "bearing" a firearm. To ship a firearm away is to do the opposite of keeping a firearm in one's presence or bearing it in case of a confrontation. And Jackson makes no effort in his opening brief to claim that "shipping" a firearm might qualify for Second Amendment coverage. *See* Opening Br. at 19. So, his claim fails in that respect.

Similarly, the act of transporting a firearm as a felony indictee as Jackson did here is divorced from the historical notion of keeping and bearing a firearm as protected by the Second Amendment. To understand why, we must first recognize that the rights afforded to felony indictees at the Founding were scant. This is because felony indictees were usually relegated to pretrial detention where the

12

ability to exercise any rights was dramatically curtailed. As the Sixth Circuit recently concluded, "the uniform founding-era practice was to categorically deny a right to bail to persons charged with certain serious offenses, and it seems that most jurisdictions effectively required pretrial detention in serious cases." *Gore*, 118 F.4th at 816; *accord United States v. Perez-Garcia*, 96 F.4th 1166, 1184-85 (9th Cir. 2024) (noting that "defendants in the founding era who faced serious charges were not released because those indicted on capital charges were not offered bail, and most felonies were capital offenses"). In this way, even where bail might be available pending trial on an indictment, bail was not available for capital offenses, *see id.*, and during the Founding Era, "virtually all felonies were punishable by death." *Tennessee v. Garner*, 471 U.S. 1, 13 (1985). Given that bail was generally denied to felony indictees, this means they were detained and disarmed pending trial. As such, during the Founding Era, there was no historical tradition of allowing indicted persons free range of travel, much less any freedom to travel across state lines while transporting a firearm.

Moreover, even for those not under indictment, transportation and sales of firearms and related implements (like gunpowder) across state lines was curtailed and regulated. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017)

13

(en banc); *accord Atkinson v. Garland*, 70 F.4th 1018, 1033 (7th Cir. 2023) ("Around the time of the American Revolution through the drafting and adoption of the Constitution and the Bill of Rights . . . . [t]here was robust regulation surrounding the . . . transport of gunpowder"); *see United States v. Libertad*, 681 F.Supp.3d 102, 112 (S.D.N.Y. 2023) (noting "a reasonably substantial record of colonial and early state-era laws regulating . . . the <u>movement</u> of firearms between colonies") (emphasis in original).   For example, Connecticut banned residents from selling firearms outside the colony.   *Teixeira*, 873 F.3d at 685.   Virginia provided that people were at "liberty to sell armes and ammunition to any of his majesties loyall subjects *inhabiting this colony*."   *Id.* at 685 n.18 (emphasis added; quotation marks omitted). Likewise, "the colonies of Massachusetts, Connecticut, Maryland, and Virginia all passed laws in the first half of the seventeenth century making it a crime to sell, give, or otherwise deliver firearms or ammunition to Indians."   *Id.*   Similarly, several colonial and early state governments likewise regulated the transportation of gunpowder.   *See* Colonial Laws of Massachusetts Reprinted from the Edition of 1672, at 126 (1890) (1651 statute) ("no person . . . shall transport any Gun-powder out of this Jurisdiction, without license first obtained from some two of the Magistrates"); 15 The Public Records of the Colony of Connecticut 191 (1890)

14

(1775 statute) (no "gun-powder made and manufactured . . . shall be exported out of the [Colony] without . . . license"); 1825 N.H. Laws 74, An Act to Regulate the Keeping and Selling, and the Transporting of Gunpowder, ch. 61, § 5.   In this way, the pre-existing right to keep and bear arms did not include an unfettered right to transport arms and related implements like gunpowder across state lines as a felony indictee.

And nothing in Jackson's opening brief demonstrates otherwise.   In fact, his analysis of how his conviction for "shipping and transporting" a firearm falls under the plain text of "keeping and bearing arms" is relegated to a single paragraph. Opening Br. at 19.   This is wholly inadequate.   For starters, Jackson makes no effort to even argue that "shipping" a firearm somehow comes within "keeping and bearing" a firearm.   Nor could he.   Shipping a firearm away is the antithesis of keeping and bearing it.   And while he blithely avers that "[t]ransporting a firearm in a car satisfies" the Supreme Court's definition of "keep[ing] and bear[ing]," *id.*, he offers no support for why this is true.   Indeed, as he admits, the Supreme Court's definition of "bearing" meant the right to "wear, bear, or carry . . . *upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person*."   *Bruen*, 597

15

U.S. at 22 (emphasis added).    Critically, Jackson omits that last portion of the definition in his brief.    *See* Opening Br. at 19.    And it is clear why:    it demonstrates the untenability of his position.    According to the agreed-upon facts, the gun here was simply transported in Jackson's vehicle.    JA 303; JA 342.    There is no indication it was on his "person" or in his "pocket," making him "ready for offensive or defensive action" during the long journey from Arizona to Maryland.    To the contrary, he was transporting the gun like any other personal effect in his vehicle. This is precisely the kind of conduct which falls outside the ambit of what the text of the Second Amendment protects.    *See Libertad*, 681 F. Supp. 3d at 109 (affirming constitutionality of 18 U.S.C. § 922(a)(3), which prohibits any non-licensed person from *transporting* into their home state a firearm from out of state, because the statute "does not on its face prohibit anyone lawfully entitled to carry a gun from lawfully acquiring one in-state consistent with the statute"); *accord United States v. Smith*, 2024 WL 328871 at *2 (D. Mass. Jan. 29, 2024).

Moreover, Jackson cannot shoehorn his conduct of "transportation" into the text of "keeping" a firearm for self-defense by averring that perhaps he needed to transport his gun in order to have it ready and available so that, when he completed his travels, he might then need the gun to defend himself.    This Court in *Price* held

16

that the reach of the Second Amendment's text cannot depend on imagined hypotheticals where the right to self-defense might possibly be impacted.   111 F.4th at 405-07 (rejecting hypothetical claim that a firearm lacking a serial number might be necessary to engage in self-defense).   Moreover, there are a number of historical cases in which courts found that individuals lacked the right to carry concealed weapons in their vehicles, even while they might have had the right to carry them on their person.  *See United States v. Adams*, 914 F.3d 602, 606-07 (8th Cir. 2019) (citing cases from 1874, 1889, and 1929).   In this way, Jackson has failed to demonstrate that the conduct for which he was charged—shipping and transporting a firearm—falls under the plain text of the Second Amendment, particularly as that text was understood at the time of the Founding.

In sum, Jackson bore the burden to demonstrate his conduct fell within the plain text of the Second Amendment.   He failed.   This Court should therefore affirm.

### C.     Jackson's Conviction For Transporting A Firearm While Under Indictment Is Consistent With The Historical Tradition Of This Country To Disarm Certain Individuals Facing Prosecution

Even if we assume, as the district court did, that Jackson's conduct falls within the text of the Second Amendment, Section 922(n) must still be upheld as fully

consistent with the historical tradition of firearm regulation which disarmed those like Jackson who were charged with felony offenses.

When comparing modern and historical gun laws, courts must "reason[] by analogy," which "requires a determination of whether the two regulations are 'relevantly similar.'" *Bruen*, 597 U.S. at 29 (citation omitted). *Bruen* gave no "exhaustive survey of the features that render regulations relevantly similar" but noted two important metrics: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* In other words, the central inquiry is "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.*

Importantly, such analogical reasoning must not result in "a regulatory straightjacket." *Id.* at 30. It "requires only that the government identify a well-established and representative historical analogue, not a historical twin." *Id.* "So, even if a regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* The Court reiterated this in *Rahimi*, chiding the dissent and the lower court for demanding a historical regulation on all-fours with the modern statute being challenged. 144 S. Ct. at 1903.

18

Before diving into relevantly similar historical analogues, however, we must first ascertain the "why" and "how" of Section 922(n), as these considerations frame the analogy analysis. *See Rahimi*, 144 S. Ct. at 1898. The precursor to Section 922(n) was enacted in 1938, and prohibited only the shipping and transporting across state lines of firearms by those under federal indictment for a crime of violence. *See United States v. Quiroz*, 629 F.Supp.3d 511, 517 (W.D. Tex. 2022). "In Congress's eyes, those under indictment for, or convicted of, a crime of violence had already 'demonstrated their unfitness to be entrusted with such dangerous instrumentalities.'" *Id.* (citation omitted). Later, Congress eliminated the crime of violence requirement, and expanded the scope of the prohibition to those indicted for any federal offense for which the maximum punishment exceeded one year in prison. *Id.* at 518. The provision was expanded again with the passage of the Gun Control Act of 1968 to apply to indictees from any court, state or federal. *Id.* The Supreme Court has observed that the purpose of the Gun Control Act was to curb "lawlessness and violent crime." *Huddleston v. United States*, 415 U.S. 814, 824 (1974). The "very structure of the Gun Control Act demonstrates that Congress . . . sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212,

19

218 (1976). With the Gun Control Act, Congress prohibited "categories of presumptively dangerous persons from transporting or receiving firearms." *Lewis v. United States*, 445 U.S. 55, 64 (1980). Additionally, Section 922(n) serves important interests of maintaining the integrity of the judicial process. Specifically, an individual indicted for a felony, which could carry significant penalties, is prohibited from obtaining a new gun which might be used to threaten or kill witnesses, prosecutors, or judicial personnel hearing the case. *Gore*, 118 F.4th at 814. Additionally, the prohibition prevents an indictee from disposing of evidence or shipping a weapon to a co-conspirator for some illicit purpose. *Id.*

Against this background, there are three distinct historical threads that sustain § 922(n)'s restriction on indicted felony defendants: (1) historical liberty restrictions on indicted defendants, including the denial of bail and pretrial detention; (2) historical laws restricting the gun rights of groups deemed dangerous or untrustworthy to obey the law; and (3) historical surety laws restricting the gun rights of people accused of posing a threat. As detailed below, each of these strands of Founding Era law is aimed at the same purpose (preventing dangerous persons from obtaining firearms) and achieves that purpose through the same means (temporary disarmament pending resolution of the criminal case or perceived threat).

20

Numerous courts have considered these threads and held them to be sufficient in *Bruen*'s wake to confirm the constitutionality of Section 922(n). *Gore*, 118 F.4th at 814-817; *United States v. Walker*, 2024 WL 4024204 at *4 (D. Minn. Sept. 3, 2024) (citing 12 lower court decisions affirming the validity of Section 922(n)); *see also United States v. Yancey*, 2024 WL 317636 at *2 (8th Cir. Jan. 29, 2024) (rejecting Second Amendment challenge to Section 922(n) on plain error review). This Court should do the same.

> ### 1.    Section 922(n) is analogous to historical laws allowing pretrial detention of indicted defendants

During the Founding Era, defendants charged with felony offenses were most often denied bail and therefore subject to disarmament during pretrial detention. Because of this historical tradition of disarming pretrial indictees, Jackson's claim fails at step two of the *Bruen* analysis.

"[T]he uniform founding-era practice was to categorically deny a right to bail to persons charged with certain serious offenses . . . ." *Gore*, 118 F.4th at 816; *accord Perez-Garcia*, 96 F.4th at 85 (noting that "defendants in the founding era who faced serious charges were not released because those indicted on capital charges were not offered bail, and most felonies were capital offenses"). This was because "virtually all felonies were punishable by death," *Garner*, 471 U.S. at 13,

and bail was universally understood as not being available for defendants charged with capital offenses. "Capital defendants have been excluded from bail"—and thus detained—"since the colonial days, and there is some evidence that this exclusion was a public-safety measure." Sandra G. Mayson, *Dangerous Defendants*, 127 YALE L.J. 490, 502 (2018); *United States v. Slye*, 2022 WL 9728732 (W.D. Pa. Oct. 6, 2022), at *2 ("The precedent for denial of pretrial release to those accused of crimes dates to the early days of the Republic—indeed to English common law.").

The Judiciary Act of 1789—passed two years before the Second Amendment's ratification—embraced this principle. It provided that a defendant accused of a federal crime could "be arrested, and imprisoned or bailed, as the case may be, for trial." Act of Sept. 24, 1789, ch. XX, 1 Stat. 73, § 33 (1789). Bail was allowed "except where the punishment may be death, in which cases it shall not be admitted but by [a court or judge], who shall exercise their discretion therein, regarding the nature and circumstances of the offence, and of the evidence, and the usages of law." *Id.*

At the Founding, moreover, detention in capital cases swept broadly because many serious crimes were punishable by death. Capital crimes "included

nonviolent offenses that we recognize as felonies today, such as counterfeiting currency, embezzlement, and desertion from the army," as well as "forgery" and "horse theft." *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2018); *see also Furman v. Georgia*, 408 U.S. 238, 335 (1972) (Marshall, J., concurring) (listing capital crimes in colonial New England, including "idolatry," "blasphemy," "assault in sudden anger," "adultery," "perjury in a capital trial," and "rebellion").

In this way, the "why" and "how" of the historical practice of pretrial detention for felony offenses is relevantly similar to the purpose of, and proscriptions in, Section 922(n). Just as the Founding Era laws uniformly provided for the detention (and therefore disarmament) of defendants facing felony charges in order to "ensure the defendant's appearance at trial and to keep the public safe in the meantime," *Gore*, 118 F.4th at 814, so too does Section 922(n). Indeed, it should be noted that Section 922(n) imposes a drastically lesser burden on defendants like Jackson than did the Founding Era practices. In the colonial days, a felony indictee was uniformly detained pretrial. Total disarmament was simply a necessary by-product of that practice. Here, however, Section 922(n) does not completely disarm a felony indictee. Rather, Section 922(n) simply prevents the indictee from obtaining new guns or transporting or shipping previously-purchased ones. This

places Section 922(n) well within the historical practice at the Founding. Therefore, because the historical tradition of detaining defendants charged with serious crimes supports the kind of narrow restrictions on shipping or transporting guns while under indictment, Section 922(n) is surely facially constitutional.

And moreover, this historical tradition is sufficient to support the charges as applied to Jackson. As detailed above, the list of capital offenses in the Founding Era was much more expansive than today. Violent offenses such as assault and murder were of course covered as capital offenses. But non-violent offenses were included as capital, and hence non-bailable, offenses as well, including forgery and embezzlement. Here, Jackson's felony offenses included "misconduct with weapons" and "hindering prosecution." If a forgery offense could be non-bailable at common law, surely the more violent conduct of "misconduct involving weapons" and obstruction of justice would suffice as a non-bailable offense at common law. *See United States v. Canada*, 103 F.4th 257, 258 (4th Cir. 2024) (holding 18 U.S.C. § 922(g)(1) is constitutional at least as applied to those convicted of a "drive-by-shooting" or "carjacking" because those groups are surely among the dangerous

individuals who historically were subject to disarmament).[1]   In this way, even as Section 922(n) was applied to Jackson here, the historical tradition of detaining pretrial felony indictees is a relevantly similar analogue and confirms the constitutional validity of Section 922(n) as applied to Jackson.

### 2.    Section 922(n) is analogous to historical laws disarming dangerous people

Section 922(n) is also analogous to laws disarming people like Jackson who have posed a danger to others and society.   This further and independently supports the constitutionality of Section 922(n).

English and American governments have long restricted some people's gun rights to promote public safety.   In 1662, for example, England empowered officers to "seize all arms in the custody or possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom."   Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662); *see Bruen*, 597 U.S. at 42 (calling "particularly instructive" the period of English history "between the Stuart Restoration in 1660 and the Glorious Revolution in 1688" (cleaned up)).   At the same time, "the act of 'going armed to

_____

[1] It should be noted that the decision in *Canada* was recently vacated by the Supreme Court and remanded for consideration in light of *Rahimi*.   *See* 2024 WL 4654952 (Nov. 4, 2024).

25

terrify the King's subjects' was 'a great offence at the common law'" if committed

with "evil intent or malice." *Bruen*, 597 U.S. at 43 (brackets and italics omitted)

(quoting Sir John Knight's Case, 87 Eng. Rep. 75, 76 (K.B. 1686)).  Further, the

1689 English Bill of Rights, which "has long been understood to be the predecessor

to our Second Amendment," *Heller*, 554 U.S. at 593, recited that King James II had

disarmed "several good subjects being Protestants." 1 W. & M., Sess. II, c.2 (Eng.).

To prevent repetition of that abuse, the Bill of Rights guaranteed that certain

subjects would "have Arms for their Defence suitable to their Conditions, and as

allowed by Law." *Id*.  The provision thus recognized that Parliament could enact

legislation regarding classes of subjects who might have access to firearms and those

who would not.  *See United States v. Jackson*, 69 F.4th 495, 502 (8th Cir. 2023).

Thus, "by the time of American independence, England had established a well-

practiced tradition of disarming dangerous persons—violent persons and disaffected

persons perceived as threatening to the crown."  Joseph G.S. Greenlee, *The

Historical Justification for Prohibiting Dangerous Persons from Possessing

Firearms*, 20 WYO. L. REV. 249, 259-261 (2020).  Moreover, there was a tradition

that legislatures like Parliament could legislate in this space and properly disarm

those deemed to be dangerous, just as our Congress did here in passing Section 922(n).

The American colonies inherited that tradition of disarming those deemed to threats to public safety. The colonies (and later the states) passed laws that "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." *Bruen*, 597 U.S. at 50. Those statutes "all but codified the existing common law in this regard." *Id.* at 49 & n.14 (citing George Webb, The Office and Authority of a Justice of Peace 92 (1736)). Before the ratification of the Second Amendment in 1791, at least four colonies or states had codified the common-law prohibition on going armed offensively and authorized the arrest of those who did so. *See* 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 52–53 (1869) (1692 statute); Acts and Laws of His Majesty's Province of New Hampshire in New England; with Sundry Acts of Parliament 17 (1771) (1701 statute); 1 Laws of the State of North Carolina, including the Titles of Such Statutes and Parts of Statutes of Great Britain as Are in Force in Said State 131–32 (1821) (1741 statute); Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force 33 (1794) (1786 statute). Three of those statutes (all but North Carolina) required forfeiture of the offender's weapons. Other

27

states soon followed.  *See, e.g.*, A Compilation of the Statutes of Tennessee of a General and Permanent Nature, from the Commencement of the Government to the Present Time 99–100 (1836) (1801 statute).   Further, early American justice-of-the-peace manuals explained that the Statute of Northampton—which the colonies inherited along with other pre-colonization statutes, *see Patterson v. Winn*, 5 Pet. 233, 241 (1831)—empowered justices of the peace to confiscate the arms of persons who carried them in a manner that spread fear or terror.  *United States v. Baker*, 2024 WL 24088 at *5 n.6 (W.D. Okla. Jan. 2, 2024) (citing James Davis, The Office and Authority of a Justice of Peace 5 (1774) (N.C.)).

Also, revolutionary and Founding Era gun regulations included those that targeted particular groups for public safety reasons.   For example, "[s]ome American colonies [] disarmed Catholics and loyalists unless they swore an oath of loyalty to the sovereign, since it was feared that they owed fealty to a foreign higher power."  *Maryland Shall Issue*, 116 F.4th at 247 (Richardson, J., dissenting).  Similarly, "[t]he earliest firearm legislation in colonial America prohibited Native Americans, Black people, and indentured servants from owning firearms."  *Range v. Attorney General*, 53 F.4th 262, 276 (3rd Cir. 2022), *vacated by* 56 F.4th 992 (3rd Cir. 2023).   These "oath laws" disarmed not just violent individuals but also those

28

who demonstrated "disrespect for the rule of law and the norms of the civic community."  *Range*, 53 F.4th at 279.

Accounts of the ratification debates confirm the Founders' belief that disarming select groups for the sake of public safety was permissible.  *Heller* identified as a "highly influential" "precursor" to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents.  554 U.S. at 604.  That report recognized that the government could disarm potentially dangerous or untrustworthy people, stating that citizens have a personal right to bear arms "'unless for crimes committed, or real danger of public injury.'"  *Id.* at 658 (citation omitted).  Similarly, Samuel Adams offered an amendment at the Massachusetts convention to ratify the Constitution, recommending "that the said Constitution be never construed to authorize Congress … to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms."  *Heller*, 554 U.S. at 658 (citation omitted) (emphasis added).  Thomas Cooley's 1868 treatise, which *Heller* described as "massively popular," 554 U.S. at 616, later explained that some groups were "almost universally excluded" from exercising certain civic rights like gun rights, including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, A

29

Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 29 (1st ed. 1868), reprinted at JA 123.

Finally, if these historical sources were not enough, we have the Supreme Court's most recent exegesis in *Rahimi*, which concluded that "[o]ur tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others." 144 S. Ct. at 1902. The Court based this conclusion on two primary sources: the surety and going-armed laws that were extant in the Founding Era. *Id.* at 1900-02. The Court described the "going-armed laws" as a "mechanism for punishing those who had menaced others with firearms." *Id.* at 1900. Similarly, the surety laws (discussed further *infra*) were designed to disarm potentially violent individuals before they could act. *Id.* In this way, there can be no doubt: the Founding Era had a tradition of disarming individuals who were deemed potentially dangerous to society. The Second Amendment thus incorporates "a common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible" and "'does not preclude laws disarming the unvirtuous (i.e. criminals).'" *United States v. Bena*, 664 F.3d 1180, 1183–84 (8th Cir. 2011) (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986)).

30

The tradition of disarming dangerous or non-law-abiding people supports Section 922(n)'s prohibitions.   As detailed above, Section 922(n) was designed to curb lawlessness and violence, particularly among individuals who, by virtue of their charged crimes, have demonstrated themselves to be a potential threat to public safety.   This is precisely in line with the historical precedents cited above.   Both in England and the colonies, legislatures broadly permitted the disarmament of classes of persons deemed dangerous to persons or society at large.   These precedents used objective criteria (i.e. the person's status or conduct or failure to offer an oath) and barred gun possession until such threat was abated.   This is precisely what Section 922(n) does.   Congress declared that felony indictees posed a risk to society and proscribed their possession of weapons, at least during the pretrial period.   In this way, these historical precedents are relevantly similar to Section 922(n).   Moreover, *Rahimi* supports this finding, given that it upheld a similar proscription on firearm possession by an as-of-yet-unconvicted person who nevertheless was deemed to pose a risk to another.   Further, Jackson's specific disqualifying felony charge (misconduct involving weapons) fits perfectly within these precedents.   Indeed, as detailed above, the "going-armed laws" were designed specifically designed to punish those who had "menaced others with firearms."   *Rahimi*, 144 S. Ct. at 1900-

31

1901.   That is similar to what Jackson was charged with doing in Arizona.   *See* JA

62-64.   In this way, the historical precedents of disarming potentially dangerous

individuals provide that Section 922(n) is constitutional as applied to Jackson.

### 3.      Section 922(n) is analogous to historical surety laws

Finally, English and American surety laws establish a historical tradition

supporting Section 922(n).   In general, surety laws "required certain individuals to

post bond before carrying weapons in public." *Bruen*, 597 U.S. at 55.   This regime

was particularly aimed at "'those persons, [of] whom there is a probable ground to

suspect of future misbehaviour.'"   *Rahimi*, 144 S. Ct. at 1899 (citation omitted).

Surety laws burdened people's right to bear arms "only if another could make out a

specific showing of reasonable cause to an injury or breach of the peace." *Bruen*,

597 U.S. at 56.   In England, a "surety of the peace followed an accusation by

someone that an individual would likely violate the law in the future."   *Young v.*

*Hawaii*, 992 F.3d 765, 791 n.12 (9th Cir. 2021) (en banc), *vacated by* 142 S. Ct.

2895 (2022).   According to Blackstone, "wherever any private man ha[d] just cause

to fear, that another will burn his house, or do him a corporal injury, by killing,

imprisoning, or beating him; … he [could] demand surety of the peace against such

person." 4 William Blackstone, Commentaries on the Laws of England 252 (1769).

And if the accused did not "find such sureties, as the justice [of the peace] in his discretion s[hould] require, he [could] immediately be committed till he [did]." *Id.* The surety was "intended merely for prevention, without any crime actually committed by the party, but arising only from a probable suspicion, that some crime [wa]s intended or likely to happen." *Id.* at 249.

Like other English traditions, the surety practice was adopted in the American colonies. *See Bruen*, 597 U.S. at 55-56 (citing Mass. Rev. Stat. ch. 134, § 16 (1836) and noting that "[b]etween 1838 and 1871, nine other jurisdictions adopted variants of the Massachusetts law").

Surety laws establish a historical tradition sufficient to support modern gun restrictions on indicted defendants. Just like Section 922(n), the surety laws provided for a mechanism for disarmament upon the probable cause showing that an individual poses a threat to breach the peace. Moreover, just like 922(n), the surety laws provided for a deprivation that was only temporary in duration. *See* 4 Blackstone 249-50 (explaining that surety laws' restrictions applied only for a specified time). And while surety laws generally required an individualized showing that the restricted person was threatening or dangerous, *see Bruen*, 597 U.S. at 56, a felony indictment serves an analogous function. That is, Congress

33

permissibly determined that people whom a grand jury credibly accuses of having committed a felony are categorically likely to abuse guns. *See Quiroz*, 629 F.Supp.3d at 517 (explaining that Section 922(n)'s predecessor applied to those whose conduct "demonstrated their unfitness to be entrusted with such dangerous instrumentalities" as guns). Hence, they are categorically threatening enough to warrant temporary gun restrictions. Moreover, the Supreme Court was careful not to "suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." *Rahimi*, 144 S. Ct. at 1901. So, a categorical proscription is perfectly permissible. And in fact, the showing required for a felony indictment (probable cause that a crime was committed) is higher than the showing required under the surety laws (only a probable suspicion of some potential future misbehavior). Further, just like 922(n), the surety laws did not require a criminal conviction before disarmament could occur. In this way, the surety laws provide a relevantly similar analogue to 922(n) generally.

*Rahimi* provides additional support for this conclusion. As the Supreme Court explained, surety and going-armed laws "restrict[ed] gun use to mitigate demonstrated threats of physical violence." *Rahimi*, 144 S. Ct. at 1901. Section

922(n) is motivated by similar public safety concerns. "[T]he period in which an indictment pends is 'a volatile period during which the stakes and stresses of pending criminal charges often motivate defendants to do violence to themselves or to others,' thereby reasonably giving rise to fear of threats or violence among the community." *United States v. Rowson*, 652 F. Supp. 3d 436, 470 (S.D.N.Y. 2023) (citation omitted). Section 922(n) addresses those fears by limiting the ability of indicted defendants to obtain new weapons that could be used to harm the community. In this way, as explained by *Rahimi*, the surety laws are relevantly similar here.

And the surety laws are a particularly good fit for the present case given the charges against Jackson. Specifically, the surety laws were designed to protect the public and prevent a breach of the peace for those suspected of "future misbehaviour." Here, after being charged with misconduct involving weapons, Jackson clearly can be deemed to be someone who poses a threat of future misbehavior. Indeed, case in point, while he was indicted on the Arizona charges, Jackson repaired to Maryland and was involved in blocking the ingress and egress to the Hagerstown Speedway and then failed to take the advice of police officers to leave the area for the night because he wanted to retain access to his cache of firearms

35

which he left at his campsite.   JA 67.   If this were not enough, an additional gun was found in his vehicle upon a later search.   JA 19.   Jackson thus falls comfortably within the class of persons to whom the surety laws would have applied.   Indeed, as Jackson himself admits, Opening Br. at 42, the Arizona state judges could have detained him, or wholly restricted his access to all firearms during his pretrial detention period.   If Jackson could have been detained upon indictment, or temporarily stripped of his right to possess a firearm in Arizona, then surely Congress could impose Section 922(n)'s lesser restriction without violating the Second Amendment.

In sum, based on the historical tradition of the surety laws, Section 922(n) must be upheld as constitutional as applied to Jackson.

* * *

The historical traditions discussed above restricting defendants accused of crimes confirm the constitutionality of § 922(n).   First, § 922(n) and the historical precursors are all "comparably justified."   *Bruen*, 597 U.S. at 29.   Pretrial detention, the powers of the sureties, and the seizure of arrestees' weapons all serve the government's interests in "bringing the accused to trial" and in "preventing crime by arrestees."   *United States v. Salerno*, 481 U.S. 739, 745, 750 (1987).   Section

922(n) serves similar purposes.  It reduces the risk that criminal defendants will use firearms to facilitate their flight, and it helps ensure that indicted criminal defendants do not use firearms to commit other crimes while awaiting trial.  The "burden[s]" imposed by Section 922(n) are also "comparable" in important ways to the burdens imposed by historical restrictions on accused defendants.  *Bruen*, 597 U.S. at 29. Like those precursors, Section 922(n) applies only to those who have been accused based on probable cause, not to all members of the public at large.  And like those precursors, § 922(n) imposes only a temporary restriction on the defendant's rights. It remains in force during the criminal proceeding, but ceases to operate once the case ends.  Indeed, in many ways, Section 922(n) is significantly less burdensome than the restraints on criminal defendants' liberty accepted at the Founding.  As the district court properly found, these historical restrictions on accused defendants show that Section 922(n) is consistent with this Nation's historical tradition under *Bruen* and *Rahimi*.

And nothing in the opening brief demonstrates otherwise.

For example, while Jackson claims that the Second Amendment does not permit disarmament based on a category such as dangerousness, Opening Br. at 29, that is obviously wrong.  *Rahimi* said clearly that "[o]ur tradition of firearm

regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others." 144 S. Ct. at 1902. And the Court held that its opinion should not be construed to require individualized findings in each case; class-wide proscriptions are permissible. *Id.* at 1901. Further, as detailed above, Jackson over-reaches when he avers that the Court's rejection of the term "responsible" in *Rahimi* must be read as a rejection as well of the notion that dangerous individuals can be disarmed. Opening Br. at 30-32. Indeed, the entire point of *Rahimi* is that the defendant there was dangerous and posed a threat to an individual and hence could be disarmed. In other words, while "responsible" might have been a vague term, dangerousness is not. And in this as-applied challenge, Jackson clearly falls into the camp of being dangerous given that he was indicted for "misconduct involving weapons."

Next, Jackson tries to discount the district court's analysis because it allegedly failed to cite to relevant Founding Era statutes, or failed to offer enough cites to satisfy the bar set by Jackson himself. Opening Br. at 33-38. This is wrong on two levels. For starters, the record below fully demonstrates Founding Era statutes and regulations that supported all three strands of historical analogues, including the thread of statutes and cases about the disarming of dangerous individuals.

Specifically, the "going-armed" and surety laws cited above more than satisfy the government's burden.  Moreover, the *Rahimi* decision clearly lays out the historical pedigree of the "going-armed" and surety laws.  Jackson cannot complain about a lack of citations by the district court when the Supreme Court has definitively catalogued the relevant historical analogues and made a determination that they established a proper historical tradition.

But more fundamentally, Jackson's complaint is in error because it invites this Court to fall into the very trap that the Supreme Court in *Rahimi* chided the Fifth Circuit for falling into, namely, requiring some numerical quota of one-to-one statutory exemplars to establish a historical tradition.  144 S. Ct. at 1903.  To demonstrate a relevantly similar historical tradition, it is simply not necessary to demonstrate the existence of statutes from all 13 colonies which parrot the verbiage in Section 922(n).  Because the record here is more than adequate, this complaint should be rejected.

Moreover, this critique fails because *Rahimi* clarified that the government need only show congruence between a current statute and the Founding Era "*principles*," regardless of whether those principles were reduced to positive laws in the form of statutes.  *See* 144 S. Ct. at 1898 ("[T]he appropriate analysis involves

considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition."); *id.* ("The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'"); *id.* at 1905 (Barrett, J., concurring) (observing that the majority "distill[ed] principles from a variety of historical evidence rather than insisting on a precise historical analogue"); *id.* at 1925 ("Historical regulations reveal a principle, not a mold.").

Similarly, Jackson attempts to downplay the relevance of this Court's pre-*Bruen* decisions.  Opening Br. at 39-40.  However, this Court has recently clarified that its pre-*Bruen* opinions remain binding to the extent they are not directly overruled by intervening precedent, *Bianchi v. Brown*, 111 F.4th 438, 448 (4th Cir. 2024) (en banc), which has not occurred here.

Further, Jackson makes the claim that there was no showing that he himself was dangerous.  Opening Br. at 41-42.  That is incorrect.  A grand jury charged him with "misconduct involving weapons."  Indeed, the weapon in question was a rifle loaded with ammunition.  And these charges were lodged following an incident at a protest during which Jackson was also charged with hindering the prosecution and arrest of his co-defendant.  That set of facts is more than sufficient to

40

demonstrate that Jackson presented himself as potentially posing a threat of violence. Moreover, his charges were felonies, which are serious crimes that come with potential jail time. The fact that the grand jury charged him with such crimes, coupled with the admitted facts of the case, are more than enough to demonstrate Jackson was potentially dangerous. Nor can Jackson gain any traction from the fact that the Arizona magistrate judge did not impose conditions on him that entirely prohibited his access to firearms. Indeed, Section 922(n) would not have done that either; if he stayed in Arizona, he could have retained any weapons he currently had. The issue here is the felony indictment and what it means. As detailed above, Congress has determined such individuals to be potentially dangerous, both by the fact that the charges carry serious jail time and because an indictee poses a potential danger to obstruct justice or flee from the jurisdiction, using a firearm. In this way, this set of facts demonstrates why Jackson is rightly considered among the kind of potentially dangerous individuals who historically were disarmed during the pretrial period.

Additionally, while Jackson attempts to downplay the relevance of Founding Era laws generally prohibiting bail (and therefore requiring disarmament) for felony indictees, Opening Br. at 49-55, these arguments miss the mark. He first tries to re-

41

imagine that the only purpose of the colonial era bail provisions was to ensure that the defendant appeared in court.  But, as detailed above, that is not true; the bail provisions also had the purpose of preventing further crimes committed by the defendant.  *See* Mayson, *Dangerous Defendants*, 127 YALE L.J. at 502.  Moreover, his claims fail to account for why some offenses were bailable.   In other words, why would colonial era practices make murder non-bailable but lesser crimes subject to bail?  The answer is obvious:  the murderer poses a greater potential threat to the public and therefore is not going to be permitted bail in the interests of public safety.  Similarly, felony indictees like Jackson pose a higher risk of danger than, say, misdemeanor indictees, and that places Jackson more in line with the class of persons who would have been disarmed at the Founding.

Jackson's arguments on the "how" of Founding Era bail procedures fail as well.  While he avers that Founding Era bail reviews were individualized proceedings and he tries to contrast those findings with his felony indictment, he fails to see that grand jury indictments are necessarily individualized findings as well.  A grand jury in Arizona made an individualized, probable cause finding that Jackson committed a crime, namely misconduct involving weapons.  That is necessarily the kind of individualized finding that is relevantly similar to historical

42

bail review practices.   Moreover, *Rahimi* dispels the notion that a petit jury-level conviction is required before disarmament can occur.   In sum, contrary to Jackson's claims, the Founding Era pretrial detention practices for felony defendants confirms the validity of Section 922(n).

Jackson's final argument is that the surety laws are not "analogous enough" to Section 922(n).   Opening Br. at 56-58.   This is wrong.   As *Rahimi* clarified, the relevantly similar standard is not nearly that exacting.   As detailed above, Section 922(n) need only be analogous to Founding Era "principles," not necessarily to a string of similar Founding Era laws.   And here, the surety laws were aimed at curbing violence by those who were reasonably suspected of being capable of future misconduct.   Section 922(n) is aimed at a similar class of persons.   Likewise, the surety laws provided for temporary disarmament, just like Section 922(n) only applies temporarily during the pretrial period.   The similarities are more than enough to meet the bar established by *Rahimi*.

In sum, Jackson fails to offer a sufficient rebuttal to the district court's conclusion that Section 922(n) is constitutional as applied to Jackson.   This Court should affirm.

## CONCLUSION

For the reasons stated above, this Court should affirm the district court's finding that 18 U.S.C. § 922(n) is constitutional as applied to Jackson.

Respectfully submitted,

Erek L. Barron
United States Attorney

David C. Bornstein
Assistant United States Attorney
Chief, Appellate Division

_____/s/_____
Jason D. Medinger
Assistant United States Attorney

44

## STATEMENT WITH RESPECT TO ORAL ARGUMENT

The United States respectfully suggests that oral argument is not necessary in this case.

**CERTIFICATE OF COMPLIANCE**

1.    This brief has been prepared using:

**Microsoft Word, Times New Roman, 14 Point**

2.    EXCLUSIVE of the corporate disclosure statement; table of contents; table

of citations; statement with respect to oral argument; any addendum

containing statutes, rules, or regulations, and the certificate of service, the

brief contains 9,276 words.

I understand that a material misrepresentation can result in the Court's

striking the brief and imposing sanctions. If the Court so directs, I will provide an

electronic version of the brief and/or a copy of the word or line print-out.

_____/s/_____

Jason D. Medinger
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 25th day of November 2024, I

electronically filed the foregoing with the Clerk of Court using the CM/ECF System,

which will send notice of such filing to the following registered CM/ECF users:

Cullen Macbeth
Assistant Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 344-0600

_____/s/_____
Jason D. Medinger
Assistant United States Attorney

47